Terry Lee DOUGLAS,
Petitioner, Appellant,

v.

COMMISSIONER OF PUBLIC
SAFETY, Respondent.

No. C1–85–1774.

Court of Appeals of Minnesota.

April 22, 1986.

Review Denied June 19, 1986.

Manly A. Zimmerman, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., Joel A. Watne, Asst. Atty. Gen., St. Paul, for respondent.

Heard, considered and decided by POPOVICH, C.J., and LANSING and HUSPENI, JJ.

## OPINION

HUSPENI, Judge.

The Commissioner of Public Safety revoked the driving privileges of appellant Terry Lee Douglas for refusing testing under the implied consent law. Douglas petitioned for judicial review, and the trial court sustained the revocation. We reverse.

## FACTS

At approximately 10:30 p.m. on March 27, 1985, Deputy Sheriff Michael Snell investigated an automobile accident in which Douglas was involved. When Snell arrived

at the intersection of Sherburne County Road 30 and Sherburne County Road 14, the scene of the accident, Douglas was in his automobile on the median. Snell spent between 35 and 40 minutes at the scene. Douglas complained of pain and difficulty breathing, and was taken to the Monticello Hospital.

When Snell arrived at the hospital, Douglas was in the emergency room. The hospital staff had administered an IV to Douglas and Snell believed they had also run an EKG. Douglas was catheterized, his clothing was being removed, and he was being given oxygen. Although Snell did not recall, it was possible he was advised that Douglas' condition was critical. Snell was informed that Douglas would be transferred to North Memorial Hospital in Minneapolis.

Snell asked the attending physician if he could read the implied consent advisory to Douglas. The doctor told Snell that they had taken one set of x-rays and were waiting for that set to be developed before taking a second set and that Snell could make his test request during this waiting period if he wished. Snell then proceeded to read the implied consent advisory to Douglas. He began at 11:59 p.m. and it took him about five minutes to complete the reading. Snell indicated that usually he reads an implied consent advisory in about two minutes.

Snell testified that Douglas appeared to be conscious at all times, and that he never saw him in an unconscious condition. Snell asked Douglas if he understood the advisory, and he said he did. He asked Douglas if he would take a blood test, and Douglas said he wanted his x-rays. Snell advised Douglas that there was a delay in the x-rays, and that he had time to take the test. Douglas again said he wanted his x-rays. Snell repeated the request, and Douglas once more stated that he wanted his x-rays. Snell stated that he believed Douglas understood that he was asking Douglas to take the test.

Snell further testified that he considered directing the doctor to take the blood test without Douglas' consent. He thought that to do so, however, could be traumatic causing Douglas to perhaps become excited or angry or resist the procedure which could worsen Douglas' medical condition. Snell testified that he made this decision before reading the implied consent advisory.

Dr. Florian Brion treated Douglas at the Monticello Hospital. He testified that Douglas had a fractured femur and was in great pain. He also complained of pain in his chest and his head. Douglas was put on intravenous feedings because his blood pressure continued to decrease. Dr. Brion explained that the decrease in blood pressure indicated that there was internal bleeding. He advised North Memorial Hospital of this condition and as soon as the second set of x-rays was completed, Douglas was rushed to North Memorial Hospital by ambulance. The Monticello Hospital records showed that Douglas was admitted there at approximately 11:15 p.m., and left for Minneapolis at 12:20 a.m.

While treating Douglas, Dr. Brion asked him some questions. Douglas answered the questions, but Dr. Brion explained that when blood pressure is decreasing, the patient is in a "shock condition" and a doctor cannot predict whether the patient knows what he is saying. Dr. Brion did not know whether Douglas was disoriented.

Medical records relating to Douglas' accident were admitted into evidence, and Dr. Brion explained some of the comments in these records. He stated that the comment that the patient was "groggy, but oriented" meant that the patient knew where he was. Dr. Brion indicated, however, that in most accident cases, he can ask the patient the same question again and the patient would not remember what he answered before. Dr. Brion said it was hard to define what was oriented or disoriented.

Another comment Dr. Brion was asked to explain was: "Arrived by ambulance in serious condition, although able to verbally respond and comprehend all commands." He testified that this means the patient can answer, respond and comprehend, and if he

gives a command, the patient can respond. He also indicated that as time went on, conditions could change. Dr. Brion also explained the comment "Sick patient is able to comprehend and follow all commands. Although, speech not fluent, patient responded to verbal stimuli and painful stimuli." He indicated that at the time the note was made, Douglas was capable of understanding and responding to stimuli. Dr. Brion stated that he did not think Douglas was unconscious, but he was in a hypotensive condition, which meant that his blood pressure was below 100. If the blood pressure is that low, the brain is not functioning right, and a patient could automatically answer a question without knowing what he is saying.

Finally, Dr. Brion was asked by the Commissioner whether a blood test could have been taken from Douglas during this time, if he agreed to it. Dr. Brion said he thought so, but when there is a seriously injured patient in the emergency room, medical staff are always more concerned with stabilizing the patient. The first tendency is to get the patient stabilized. He testified that if the patient is not in shock, and if the patient's vein can be felt, it takes about one minute to take a blood sample.

Douglas testified that he did not remember the accident or any of the events which occurred in the Monticello Hospital. His first memory was waking up in North Memorial Hospital eighteen days later. His doctors told him that he had a collapsed lung, his pancreas was almost torn in two, his small intestine was lacerated and bleeding, his stomach and liver were bleeding, and his femur bone was broken and could not be set until his vital signs were stable. Douglas underwent nine hours of surgery almost as soon as he arrived at North Memorial Hospital, with an additional six hours the following day. His leg was operated on fifteen days later.

## ISSUE

Was the physical condition of the driver such that the officer should have invoked the provisions of Minn.Stat. § 169.123, subd. 2c?

## ANALYSIS

The implied consent law provides that drivers in this state consent to a chemical test to determine the presence of alcohol. Minn.Stat. § 169.123, subd. 2(a) (1984). Further, Minn.Stat. § 169.123, subd. 2c (1984) provides:

A person who is unconscious or who is otherwise in a condition rendering the person incapable of refusal is deemed not to have withdrawn the consent provided by subdivision 2 and the test may be given.

Evidence was presented on the issue of whether Douglas was incapable of refusing. *See Stiles v. Commissioner of Public Safety*, 369 N.W.2d 347 (Minn.Ct. App.1985). *Accord State v. Stransky*, 384 N.W.2d 612 (Minn.Ct.App.1986). The trial court sustained the revocation of Douglas' driving privileges, apparently on the grounds that Douglas was capable of refusing a chemical test and did refuse.

We conclude that the record cannot sustain the trial court's determination. We noted in *Stiles* that the question of a driver's capacity to refuse a test was a troubling one. Again we are called upon to address that issue. It remains troubling. In *Stiles*, we held that, in view of the serious injuries sustained by the driver, the officer should have considered the driver's consent to be continuing and ordered that a test be given. 369 N.W.2d at 353. Also, we made the following observation in *Stiles*:

Finally, we note that Minn.Stat. § 169.-123, subd. 2c (1984), effective some 80 days after the events here and applicable to all offenses committed on or after August 31, 1984, addresses the concerns now before this court.

*Id.*

The incident in this case occurred nearly seven months after the effective date of

subdivision 2c. We believe that subdivision is applicable to the facts of this case.[1]

Turning first to a consideration of the extent of Douglas' injuries, unquestionably they were critical.[2] He was undergoing multitudinous emergency room procedures. X-rays were being taken. He was catheterized. An IV and possibly an EKG were administered to him. He was being given oxygen. He spent only approximately sixty-five minutes in the local hospital before being transferred to a larger hospital. His responses to repeated requests that he take a chemical test clearly indicated his continuing concern with the results of his x-rays.

A review of the officer's reactions to the events occurring in the emergency room strengthens our conviction that the special facts of this case mandate application of the provisions of Minn.Stat. § 169.123, subd. 2c. Officer Snell testified that he may have been informed that Douglas' injuries were critical. Even if he had not been so informed, Snell was aware at the scene of the accident that Douglas was complaining of pain and had difficulty breathing. At the hospital emergency room, Snell was able to observe the many sophisticated medical procedures being administered to Douglas, and was advised that Douglas would be transferred to North Memorial Hospital. Commendably, and perhaps most telling, Snell considered asking the doctor to take blood without Douglas' consent, but he rejected that course of conduct because he felt that to take blood could be traumatic and could worsen Douglas' condition. This very humanitarian concern on the part of Snell was yet another indication, this time a subjective one, that Douglas' condition was of such a nature and degree as to bring it within the purview of subdivision 2c.

We note that this court recently reversed a trial court's determination that a driver was incapable of refusing to take a chemical test to determine alcohol concentration. In *Thornton v. Commissioner of Public Safety*, 384 N.W.2d 606 (Minn.Ct.App. Apr. 8, 1986), the driver was walking outside of his car when first sighted by the officer and was bleeding from a head wound. At the emergency room the driver stated that he understood his rights, that he would not submit to testing until he talked with his lawyer, and that his reason for refusing was that he wanted to call a lawyer. There was no evidence of any extensive emergency room treatment.

We find that the facts of *Thornton*, and therefore the applicability of subdivision 2c, are distinguishable from this case. In response to questions regarding testing, Thornton responded that he wanted to speak to a lawyer; Douglas three times responded that he wanted his x-rays. Compared to a record reflecting no extensive emergency room procedures in *Thornton*, Douglas was receiving oxygen, catheterization, x-rays, an IV, and possibly an EKG. There was no evidence in *Thornton* that the officer feared that the mere procedure of taking blood could increase the patient's trauma. The commendable subjective concerns expressed by Snell about Douglas were not present in *Thornton*.

We recognize that ultimately the decision to invoke or not to invoke the provisions of Minn.Stat. § 169.123, subd. 2c must be made by a peace officer upon consideration of subjective criteria and often under conditions of rapidly changing circumstances. Those subjective decisions, made in good faith, are often scrutinized in subsequent legal proceedings. It is impossible to fashion infallible guidelines. However, when, as here, the driver is receiving a multitude of emergency room treatment procedures

1. Contrary to *Rude v. Commissioner of Public Safety*, 347 N.W.2d 77 (Minn.Ct.App.1984), subdivision 2c appears to make the ability to refuse relevant. The continued validity of *Rude* on this issue is questionable.

2. We recognize that the full extent of Douglas' injuries may not have been apparent at the Monticello Hospital. Nonetheless, the scope of the emergency treatment being rendered there and the measures taken by medical personnel to prevent a worsening of the patient's condition were evident.

necessitated by extensive and traumatic injury, the officer must seriously consider the applicability of subdivision 2c to the circumstances at hand.[3] Failure to do so may deny the Commissioner the ability to institute revocation procedures.

In light of our resolution of this issue, we do not address the other matters raised by Douglas.

### DECISION

Under the facts of this case, the provisions of Minn.Stat. § 169.123, subd. 2c applied. Because they were not invoked, the revocation of appellant's license must be rescinded.

Reversed.

---

**3.** If the officer is concerned about whether a blood test will further endanger an injured driver's physical condition, the officer should seek the opinion of the attending physician, rather than make a personal assessment of the situation.