Joan E. VILLENEUVE,
Petitioner, Appellant,

v.

COMMISSIONER OF PUBLIC
SAFETY, Respondent.

No. C6–87–1161.

Court of Appeals of Minnesota.

Jan. 5, 1988.

Harry E. Eliason, Hibbing, for petitioner, appellant.

Hubert H. Humphrey, III, Atty. Gen., Kenneth H. Bayliss, III, Sp. Asst. Atty. Gen., St. Paul, for respondent.

Considered and decided by HUSPENI, P.J., and SEDGWICK and LOMMEN,* JJ.

## OPINION

SEDGWICK, Judge.

The Commissioner of Public Safety revoked the driver's license of Joan E. Villeneuve because she refused chemical testing to determine her alcohol concentration. She petitioned for judicial review, arguing that she was physically incapable of refusal. The trial court sustained the revocation and she appeals.

## FACTS

On February 17, 1987, at approximately 12:25 a.m., Sergeant David Bennett saw a vehicle in a low ditch in a remote area. He observed that a vehicle had plowed through a snowbank, and he saw appellant standing outside of her vehicle.

Bennett asked appellant to step back to the dry pavement and then enter his squad car. He noticed her walk was unsteady, she had difficulty finding her driver's license, she smelled of alcohol, her clothing was messed up, and her eyes were bloodshot. The officer arrested her for driving while under the influence.

Bennett read the implied consent advisory to appellant. She indicated she understood the questions and agreed to take the test. He then transported her to the jail. Bennett, a certified Intoxilyzer operator, then ran an Intoxilyzer test. Appellant attempted to take the test. The officer testified that she continued to place her tongue over the mouthpiece and impeded the flow of air so that no breath sample was given. He asked if she wanted a blood test and she said: "No, I'll do this one." She again placed her tongue over the mouthpiece, contrary to the instructions which she received. No adequate sample was obtained.

Bennett observed appellant closely and did not see any evidence of injuries. He revoked her license for refusing testing.

The next day, Dr. Katherine Guthrie at the Deer River Clinic examined appellant, observed bruises on her face and forehead, and determined that she suffered a concussion. Guthrie testified that appellant may have been confused about the method of taking the breath test as a result of the concussion, even though she showed no sign of injury and responded normally to the officer. Appellant told the doctor she did not use alcoholic beverages the night of the accident.

The trial court sustained the revocation.

## ISSUE

Did the trial court err in sustaining the revocation?

## ANALYSIS

■ Any person who drives, operates, or is in physical control of a motor vehicle consents to a chemical test for purposes of determining the presence of alcohol. Minn. Stat. § 169.123, subd. 2(a)(1986). Appellant here failed to provide an adequate breath sample for the Intoxilyzer, which constitutes a refusal to submit to breath testing. Minn.Stat. § 169.123, subd. 2b(c). If a driver refuses testing, her license to drive will be revoked for one year. Minn.Stat. § 169.123, subd. 4.

Appellant asserted below, and on appeal, that she was incapable of refusing testing Minn.Stat. § 169.123, subd. 2c.

> A person who is unconscious or who is otherwise in a condition rendering the person incapable of refusal is deemed not to have withdrawn the consent provided by subdivision 2 and the test may be given.

Minn.Stat. § 169.123, subd. 2c (1986).

In sustaining the revocation, the trial court found that the officer performed every step necessary to invoke the implied consent law. The court found that appellant exhibited several indicia of being un-

* Acting as judge of the court of appeals by appointment pursuant to Minn. Const. art. 6, § 1.

der the influence, including smelling of alcohol, that she was properly placed under arrest when the implied consent was read to her, that she indicated she understood the questions and agreed to take the test, that at no time did she indicate she was unable to perform the test, and that she placed her tongue over the mouthpiece of the Intoxilyzer, thereby impeding the flow of air to the extent that no test was obtained. The court also found that when appellant was examined the next day, a doctor determined that she suffered a concussion and "may have been sufficiently confused by the concussion so as to be confused about the method of taking the breath test, even though appearing normal and responding normal to the officers."

The court ordered suspension of petitioner's license for the following reasons:

1. Sergeant Bennett properly performed each and every step necessary to require the Implied Consent Law to be applicable.

2. At no time did the petitioner make any indication to the officer that she was unable to perform the Intoxilyzer 5000 test. Indeed, when offered an alternative test, refused that test and elected to continue with the breath test.

3. It was not within the knowledge nor the obtainable knowledge of the officer that the petitioner may be having some confusion or difficulty in the manner of giving the test.

4. It is the public policy of the State of Minnesota to, in most cases, require drivers suspected of driving under the influence to be administered a blood-alcohol analysis, and it would be inappropriate for petitioners to in each case allege that they were confused, whether it be just by the arrest and the associated anxieties or actual trauma. If that were the case, the entire law would be frustrated. Because if a defendant is unconscious, or unable to respond, the officer can, with the proper prerequisites, order his blood drawn.

In the instant case, the officer had no indication that the responses obtained were not voluntary and intelligently given. He could not order the blood alcohol taken and is now faced with the problem of having tried to administer the test and having a refusal by inability to perform, and the current medical testimony seemingly indicates that there was an inability to consent which would have given him, had he known at the time, the right to require blood to be drawn. In other words, the petitioner, in effect, according to what is now being said, would, I believe, be considered for the purposes of the law unconscious. And I do not believe that the public policy of the State of Minnesota requires the officer to have that kind of medical knowledge, but must proceed in accordance with the information available to him at the time.

The trial court's conclusion is supported by decisions of the supreme court and this court which require the officer to make the factual determination as to whether the driver's injuries had rendered him unconscious or disoriented to the extent that he could not make a rational choice whether to refuse or take the test.

In *Tyler v. Commissioner of Public Safety*, 368 N.W.2d 275 (Minn.1985), the supreme court stated:

It would be improper and unfair to revoke a driver's license for refusing to take a test if an advisory were not given. * * * [The advisory] is aimed at letting a driver know the serious consequences of his refusal to take a test. * * *

Id. at 280. There was no indication that Tyler was unconscious, disoriented or otherwise lacked capacity to understand the implied consent advisory.

In *Nyflot v. Commissioner of Public Safety*, 369 N.W.2d 512 (Minn.1985), *appeal dismissed*, 474 U.S. 1027, 106 S.Ct. 586, 88 L.Ed.2d 567 (1985), the Minnesota Supreme Court stated:

As the United States Supreme Court reemphasized in *South Dakota v. Neville*, 459 U.S. 553, 559, 103 S.Ct. 916, 920, 74 L.Ed.2d 748 (1983), its decision in *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), "clearly allows a State to force a person suspected of driving while intoxicated to

submit to a blood alcohol test." The legislature, therefore, could repeal the implied consent law and direct police officers to administer chemical tests against the suspect's will. *Id.* The obvious reason the legislature has chosen to retain the implied consent law is to avoid violent confrontations which could occur when people are forced to submit to testing. *Id.* 459 U.S. at 559–60, 103 S.Ct. at 920–21. The legislature's decision to let people refuse in the ordinary case and not be forced to take a test does not mean that the defendant has a *right* to refuse. Even though arrested drivers do not have a right to refuse, they do have an important decision to make * * *.

Id. at 517 (footnote omitted) (emphasis in original).

■ The criteria is the extent of apparent injuries, and where manifest injuries have been great, the driver has prevailed. In *Stiles v. Commissioner of Public Safety*, 369 N.W.2d 347, 351 (Minn.Ct.App. 1985), Stiles suffered a seizure and lost consciousness at the scene of the accident, had serious internal injuries, had been conscious for only a short time when the advisory was read, was disoriented, and was strapped to an emergency room gurney and encumbered by numerous tubes, needles, monitors and breath apparatus. Stiles was in shock and in great pain. This court held that when the officer determined Stiles was disoriented, he should have deemed his implied consent continuing and ordered a test. *Id.* at 352.

In *Thornton v. Commissioner of Public Safety*, 384 N.W.2d 606 (Minn.Ct.App. 1986), the driver also asserted he was incapable of refusal because he was confused and disoriented from the accident, in which he suffered a wound on his forehead that was bleeding extensively. Thornton refused testing at the scene, asserting that he wanted to talk to an attorney. This court reversed the trial court's decision that the officer should have administered a blood test pursuant to Minn.Stat. § 169.123, subd. 2c, noting respondent's responses indicated he was capable of making a decision to refuse. The court also

rejected an argument that the Commissioner had a burden to prove drivers were capable of refusing testing, and that there was no continuing consent, because it would invite voluminous litigation. Because the legislature expressly preserved the driver's right to refuse testing, this court determined it could not limit the exercise of that choice by demanding testing in every case where the driver is hospitalized because of injuries. *Id.* at 608.

In *Douglas v. Commissioner of Public Safety*, 385 N.W.2d 850 (Minn.Ct.App. 1986), *pet. for rev. denied* (Minn. June 19, 1986), the driver had critical injuries. The trial court sustained the revocation, and this court reversed, determining that the provisions of subdivision 2c should have been invoked.

We recognize that ultimately the decision to invoke or not to invoke the provision of Minn.Stat. § 169.123, subd. 2c must be made by a peace officer upon consideration of subjective criteria and often under conditions of rapidly changing circumstances. Those subjective decisions, made in good faith, are often scrutinized in subsequent legal proceedings. It is impossible to fashion infallible guidelines. However, when, as here, the driver is receiving a multitude of emergency room treatment procedures, necessitated by extensive and traumatic injury, the officer must seriously consider the applicability of subdivision 2c to the circumstance at hand. Failure to do so may deny the Commissioner the ability to institute revocation procedures.

*Id.* at 853–54 (footnote omitted).

■ The reasoning behind subdivision 2c is that if a driver is unconscious or incapable of refusing testing, the implied consent to testing is deemed continuing. *See State, Department of Public Safety v. Wiehle*, 287 N.W.2d 416, 419 (Minn.1979) (discussing issue prior to enactment of subdivision 2c). In *State v. Stransky*, 384 N.W.2d 612 (Minn.Ct.App.1986), a police officer believed the driver was unconscious and ordered a blood test taken, although the driver testified that he was in fact conscious. This court, relying on *Wiehle*, *Stiles*, and

*State, Department of Public Safety v. Hauge*, 286 N.W.2d 727 (Minn.1979), held that when the officer believed the driver was unconscious, he was justified in ordering a blood-test. *Id.* at 614.

These cases have all emphasized the officer's determination of the extent of the injuries at the time the implied consent advisory is given. Appellant here would have the court look further, and consider facts which the officer could not know at the time.

█ In this case, appellant said she understood the advisory, and agreed to the test. The officer saw that she did not provide an adequate sample, and that her tongue was blocking the airway. Further, she refused an alternative blood test. It is clear that if a person is capable of refusal, she must be given the choice of doing so. *Thornton*, 384 N.W.2d at 608; *see Nyflot*, 369 N.W.2d at 517.

█ In the case before us, we have scrutinized the record and there is adequate evidence to support the trial court's finding that the officer had no indication that appellant was physically incapable of refusal at the time of invoking the implied consent law. To hold otherwise would directly conflict with the legislature's express preservation of the choice to refuse. *See* Minn. Stat. § 169.123, subd. 4.

**DECISION**

Affirmed.