[No. C007191. Third Dist. Oct. 28, 1991.]

MARK J. HUGHEY, Plaintiff and Respondent, v.
DEPARTMENT OF MOTOR VEHICLES, Defendant and Appellant.

[redacted]

## COUNSEL

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Richard B. Iglehart, Chief Assistant Attorney General, N. Eugene Hill, Assistant Attorney General, Richard M. Frank and Ted Prim, Deputy Attorneys General, for Defendant and Appellant.

Michael S. Sands, Michael R. Nelson and M. Bradley Wishek for Plaintiff and Respondent.

## OPINION

**CARR, J.**—Following an administrative hearing, the Department of Motor Vehicles (DMV) notified respondent Mark J. Hughey (Hughey) that his driver's license was suspended for six months for his refusal to submit to a chemical test as required by law. (Veh. Code, § 13353.)[1]

Hughey then sought review of the order by petition to the superior court for a writ of administrative mandate (Code Civ. Proc., § 1094.5). The trial court ruled: "The court in exercising its independent judgment finds the preponderance of evidence does not support respondent's [DMV's] findings. The weight of the evidence does not support the finding that the arresting officer had reasonable cause to believe the petitioner was driving under the influence. The court finds that the petitioner was rendered incapable of refusing any chemical test by reason of the head trauma he sustained in the accident of July 30, 1988." The court ordered a writ of mandate to issue directing DMV to set aside its decision suspending Hughey's driver's license. DMV timely appeals.

On appeal, DMV challenges both findings of the trial court, asserting the evidence demonstrates reasonable cause to arrest Hughey and that the trial court erred in finding Hughey was not capable of refusing to submit to a chemical test. These contentions are essentially attacks on the sufficiency of the evidence to sustain the trial court's findings. However, underlying

---

[1] Further unspecified statutory references are to this code.

DMV's second assertion is the contention that the determination of whether a driver is capable of refusing a test should be subject only to the reasonable judgment of the arresting officer. In essence, DMV contends a driver may not defend an implied-consent hearing by proof of his or her lack of capacity to refuse to submit to a test.

We shall determine that a driver may defend in an implied-consent hearing by proof of lack of capacity to refuse a test and that the trial court's finding that Hughey lacked such capacity is supported by substantial evidence. This renders it unnecessary for us to review the trial court's finding that the officer lacked probable cause to arrest.[2]

## FACTS

### DMV's CASE:

On the afternoon on July 30, 1988, California Highway Patrol Officer Jeremica was sent to the scene of a motorcycle accident. Various public safety personnel were on the scene. An eyewitness indicated Hughey had been the driver of the motorcycle, Hughey admitted he was the driver and he had multiple abrasions consistent with those of a motorcycle accident victim. A witness told the officer Hughey was travelling at 45 miles per hour, lost control and went into a fence, falling off the motorcycle. Hughey had not been wearing a helmet. Jeremica testified he had been taught to take suspected head-injury victims to a doctor. No head injuries were observed by the officer or by the ambulance or fire crews.

Hughey was both "in and out," meaning he went from responsive to the irrational, and "up and down," meaning he would go from the calm to the belligerent. He had a strong odor of alcohol upon his breath, staggered as he walked, had bloodshot and watery eyes and spoke in a slow, slurred voice. His eyes displayed lateral nystagmus as "his tracking was quite poor," a phenomenon which often accompanies alcohol intoxication. (But see *People v. Loomis* (1984) 156 Cal.App.3d Supp. 1 [203 Cal.Rptr. 767]; Taylor, Cal. Drunk Driving Defense (1990) Suppression of Evidence, § 6.11, p. 35.). He was uncooperative and refused medical care. The officer abandoned his decision to take Hughey to the hospital.

When Officer Jeremica attempted to arrest Hughey for driving under the influence (§ 23152) Hughey became combative and several deputies were needed to subdue him. He was put in leg chains. While in the patrol car the

---

[2]DMV filed a request for judicial notice of a civil complaint Hughey has filed against the arresting officer. We deny that request.

officer attempted to advise Hughey in accordance with section 23157, which requires the officer to inform the driver of the penalties for refusing a chemical test. However, Hughey was "spitting and kicking the interior of the patrol car and would—would not even answer me as far as that goes. It was like he wasn't listening to me at that point or refusing to listen to me."

When they arrived at the jail further chains were required, and Hughey was taken to the booking area. There, the officer read Hughey the required admonition. Hughey appeared to hear it but the officer did not know if he asked Hughey if he understood the admonition. Hughey's answer to the "blood, breath or urine" question was "I'm not taking any test—just let me go, I'll show you something too cool man." This comment made no sense to Officer Jeremica. He arrested Hughey for driving under the influence and resisting arrest. (§ 23152, subd. (a); Pen. Code, § 148.) At Officer Jeremica's request a nurse at the jail examined Hughey and told Officer Jeremica "they would accept him into the jail."

HUGHEY'S CASE:

On July 31, 1988, after Hughey was released from jail, he was admitted to the hospital where he stayed until August 4, 1988. His hospital records were introduced at the license suspension hearing. He had a skull fracture. One notation in his records describes his mental orientation as "variable." A neurologist with substantial experience testified that Hughey had suffered a serious head injury during the accident. This would account for his bizarre combative behavior and amnesia. It would also have made it difficult, if not impossible, for Hughey to have understood the admonition delivered by the officer, nor would Hughey have understood the significance of his refusal to submit. It was unlikely that alcohol caused his behavior.

Hughey testified he had been working on the handlebars of his motorcycle and went for a test drive. He had drunk two 8-ounce beers that day. As he approached a curve the handlebars failed. He was travelling about 40 miles per hour. Hughey testified he remembered nothing between the time he lost control of his bike on a curve and the time he woke up on the floor of the jail. His fiance testified he was irrational and delirious after the accident and may not have recognized her. Another witness to the accident told Officer Jeremica that Hughey was unconscious for several minutes.

DISCUSSION

A. *Standard of Review*

The trial court reviews the administrative record by exercising its independent judgment. (*Berlinghieri* v. *Department of Motor Vehicles* (1983)

33 Cal.3d 392, 394 [188 Cal.Rptr. 891, 657 P.2d 383].) We review the trial court's findings to determine if they are supported by substantial evidence. (*Merrill* v. *Department of Motor Vehicles* (1969) 71 Cal.2d 907, 915 [80 Cal.Rptr. 89, 458 P.2d 33].)

### B. *The Implied Consent Statutes*

"Any person who drives a motor vehicle is deemed to have given his or her consent to chemical testing of his or her blood, breath or urine for the purpose of determining the alcoholic . . . [or] drug content of his or her blood, if lawfully arrested for any offense allegedly committed in violation of Section 23152 or 23153." (§ 23157, subd. (a)(1).) At the relevant time, refusal to submit to a chemical test subjected a refusing motorist to a six-month suspension of his or her driver's license or revocation of such license for a period of time determined by the number of prior alcohol-related driving offenses. (§ 13353, subd. (a).)[3]

Under the statute, a driver who does not refuse a test thereby confirms his continuing implied consent to it. The refusal to submit to a test withdraws the consent already impliedly given.

The statutes permit a driver to refuse to be tested, but the state exacts a penalty for refusal. (See, e.g., Stats. 1985, ch. 735, § 1, p. 2386 ["The Legislature finds that the state's drunk driving laws are not completely effective because of the refusal by many drivers to take the required chemical tests which show their intoxication. It is therefore the intent of the Legislature to enhance the penalties for refusal . . . ."].)  ■  The immediate purpose of this statutory scheme is to provide an incentive for voluntary submission to the chemical test and to eliminate the potential for violence inherent in forcible testing. (*Hernandez* v. *Department of Motor Vehicles* (1981) 30 Cal.3d 70, 77 [177 Cal.Rptr. 566, 634 P.2d 917].) The ultimate purpose is to deter drinkers from driving, thereby reducing the carnage on our highways. (*Kesler* v. *Department of Motor Vehicles* (1969) 1 Cal.3d 74, 77 [81 Cal.Rptr. 348, 459 P.2d 900]; *Sanchez* v. *Alexis* (1982) 131 Cal.App.3d 709, 714 [182 Cal.Rptr. 593].)

■  Before the DMV may suspend a license for a driver's failure to submit to a chemical test it must make four findings:  (1) the officer had reasonable cause to believe the driver was violating section 23152 or 23153, (2) the driver was arrested, (3) the driver refused to submit to or complete the test and (4) the driver had been notified of the consequences of refusal to

---

[3]The statute has since been amended to provide that a refusing motorist is subject to a one-year license suspension (Veh. Code, § 13353, subd. (a)(1); Stats. 1990, ch. 431, § 1.7, eff. July 26, 1990).

submit. (§ 13353, subd. (b).) If any one of the required findings is deficient, the DMV's action suspending the license must be overturned. (*Janusch* v. *Department of Motor Vehicles* (1969) 276 Cal.App.2d 193, 196 [80 Cal.Rptr. 726].)

At the time of the accident herein, section 13353, subdivision (b) provided that "the scope of the hearing shall cover the issues of whether the peace officer had reasonable cause to believe the person had been driving a motor vehicle in violation of Section 23152 or 23153, whether the person was placed under arrest, whether the person refused to submit to, or did not complete, the test or tests after being requested by a peace officer, and whether, except for the persons described in subdivision (a) of Section 23157 who are incapable of refusing, the person had been told that his or her driving privilege would be suspended or revoked if he or she refused to submit to, or did not complete, the test or tests." (Stats. 1986, ch. 527, § 4, p. 1881.) Similar language is contained in subdivision (c) of the present section 13353. (Stats. 1990, ch. 431, § 1.7; eff. July 26, 1990.)

Section 23157, subdivision (a)(5) provides: *"Any person who is unconscious or otherwise in a condition rendering him or her incapable of refusal is deemed not to have withdrawn his or her consent* and a test or tests may be administered whether or not the person is told that his or her failure to submit to, or the noncompletion of, the test or tests will result in the suspension or revocation of his or her privilege to operate a motor vehicle. Any person who is dead is deemed not to have withdrawn his or her consent and a test or tests may be administered at the direction of a peace officer." (Italics added.)

## C. *The Incapable-of-refusal Exception*

The question on this appeal is the scope of the exception provided by subdivision (a) of section 23157. If Hughey was in a condition which rendered him incapable of refusing to take the test, the statute states he is deemed not to have withdrawn his consent.

DMV postulates this section means that no subsequent evidence of a driver's incapacity to refuse may be introduced if the officer at the scene acted "reasonably;" that the statute is a directive to officers that if a driver is unconscious or incapable of refusing consent, the test or tests may be administered whether or not the person is admonished as the implied consent remains in effect; and that the decision as to whether a driver is incapable of refusing a chemical test is to be determined by the arresting officer on the scene in the exercise of reasonable judgment. Under this assertion, the only

issue for review would be whether the officer acted reasonably in concluding the driver was or was not capable of refusing the test.

Hughey urges that the exception permits a driver to prove by subsequent evidence, irrespective of the driver's statements at the scene, that the driver was incapable of refusing a test by reason of mental incapacity induced by head trauma.

We have found no California case which presented the precise question herein, wherein the officer did not confuse the driver, and where the driver, through no fault of his own, is rendered mentally incapable of refusing to submit to the test.

Our courts have consistently held that a self-induced condition rendering the driver incapable of understanding and refusing to submit to a test, particularly if the condition results from alcohol consumption, does not excuse failure to take a test. In *Bush* v. *Bright* (1968) 264 Cal.App.2d 788 [71 Cal.Rptr. 123], the trial court found the driver was incapable of refusing to submit to the requested chemical test "because of his extreme intoxication." In reversing, the appellate court stated (at p. 792): "The construction placed [on former section 13353] by the lower court and by Bush would lead to absurd consequences—the greater the degree of intoxication of an automobile driver, the lesser the degree of his accountability under the statute. It would invalidate [the section] as to grossly intoxicated drivers and frustrate the purpose of the Legislature." (See also *Goodman* v. *Orr* (1971) 19 Cal.App.3d 845 [97 Cal.Rptr. 226]; *Fankhauser* v. *Orr* (1968) 268 Cal.App.2d 418 [74 Cal.Rptr. 61].)

In *McDonnell* v. *Department of Motor Vehicles* (1975) 45 Cal.App.3d 653 [119 Cal.Rptr. 804], the court rejected the notion that there could be an impaired judgment defense in an implied consent case, where the impairment is caused in part by the voluntary consumption of alcohol. (*Id.* at pp. 662-663.) A physician testified at the license suspension hearing that the driver had suffered reactive hypoglycemia from the unexpected synergistic effects of allergy medicine and alcohol and that the symptoms of a hypoglycemia attack closely parallel those of alcohol intoxication. The driver testified he did not know prior to his arrest that alcohol could cause such a reaction. (*Id.* at pp. 657-658.) The court expressly declined to address what happens to a driver who suffers from "an unexpected seizure of hypoglycemia or other illness entirely unrelated to alcohol . . ." because the case at issue did not "involve considerations that might arise" under such circumstances. (*Id.* at p. 663.)

In *Eilinger* v. *Department of Motor Vehicles* (1985) 143 Cal.App.3d 748 [192 Cal.Rptr. 187], the driver's undisclosed and irrational fear of the police

did not render her incapable of refusal for the reason it was a self-induced condition. However, the court recognized that in an appropriate case a person might be incapable of refusal within the statute and that such incapability would be a defense: "A driver is excluded from the requirement of voluntary submission if he or she is *incapable of understanding* the requirements and consequences of the test. Implicit in such exclusion is a requirement the driver's refusal is *rational* and *disclosed* under the circumstances of the facts presented." (P. 751, original italics.)

*Plunkett* v. *Alexis* (1982) 136 Cal.App.3d 370, 374 [186 Cal.Rptr. 261], cited by the DMV on this point, is distinguishable. In *Plunkett* a panel of this court held the evidence supported the trial court's finding that the driver's pain from accident injuries did *not* preclude a finding of refusal. This was another substantial evidence case much as the case at bar, in which the court sustained as supported by substantial evidence the trial court's findings that the driver was conscious at all times, that there was no evidence the pain the driver suffered rendered him incapable of understanding the officer and the driver indicated he understood the officer. The instant appeal follows a finding of incapacity to refuse by the trial court.

*Plunkett* does state "Where, as here, the evidence is that plaintiff indicated he understood the admonition, the law requires no more of the officer. [Citation.]" (136 Cal.App.3d at p. 374.) The precedential effect of that statement is limited to the facts of that case, where the driver indicated he understood the officer's request. (*Id.* at p. 373.)

None of the cases we have reviewed precludes a driver from showing he or she should be deemed not to have refused to submit due to a medical condition unrelated to alcohol use.

We conclude the view espoused by DMV does not comport with the proper interpretation of the statute in question.

We further conclude that viewed in the light most favorable to the judgment, the evidence supports the finding that Hughey was rendered incapable of refusing to submit by reason of his head injury. Section 23157, subdivision (a)(5) provides that one who is incapable of refusal is deemed not to have withdrawn his or her consent. Hughey did not withdraw his consent as he was incapable of so doing.

In the instant case, the reasonable inference drawn by the trial court and supported by substantial evidence is that alcohol was not a cause of Hughey's mental state following the accident but that the serious head injuries sustained by him were the cause; and that Hughey was behaving

irrationally at the scene, was unconscious until the ambulance arrived and was "fading in and out." In fact, the arresting officer intended to take Hughey to a hospital until he was confronted by aggressive, belligerent behavior on Hughey's part and opted instead for a jail cell.

Some of the cases on this issue have focused on the driver's conduct at the scene. "The determining factor is not the state of the suspect driver's mind, it is the fair meaning to be given his response to the demand that he submit to the chemical test." (*Maxsted* v. *Department of Motor Vehicles* (1971) 14 Cal.App.3d 982, 986 [92 Cal.Rptr. 579]. See *Goodman* v. *Orr, supra*, 19 Cal.App.3d at p. 857.) In this case, an inference to be drawn from Hughey's statement that "I'm not taking any test—just let me go, I'll show you something too cool man" is that Hughey actually refused the test. However, this is not the inference drawn by the trial court, which inference is likewise supportable. Even the arresting officer testified the statement made no sense. Moreover, the statutory scheme expressly permits a driver to prove incapacity to refuse, leaving his or her implied consent intact.

The DMV suggests this permits second-guessing of the officer's opinion that Hughey actually refused. The "exception" does permit officers to avoid mouthing futile admonitions to persons unable to understand them because of death or unconsciousness but nothing in the statute suggests the officer's judgment in the field is determinative for the purpose of the license-suspension hearing. The argument tendered by DMV would limit judicial review of law enforcement decisions in drunk driving cases to the reasonableness of the arresting officer's conduct and would negate review of the express statutory exception of incapable of refusing a test.

Under the rubric of the rule articulated in *Thompson* v. *Department of Motor Vehicles* (1980) 107 Cal.App.3d 354 [165 Cal.Rptr. 626], that officer-induced confusion in effectively communicating the requirements of implied consent to a driver excuses the refusal to take the test, Hughey contends he did not receive an effectively communicated advisement because he was unable, by reason of his head injuries, to comprehend the warnings which may or may not have been given him. This assertion, however, is subsumed within the broader rule of the exception for incapacity to refuse to submit. Obviously if one is rendered incapable of comprehension of what is going on about him or her, he or she would not be able to understand any advisements by the officer or to formulate a response thereto.

Moreover, in *Thompson, supra*, in sustaining the trial court's finding that at the time the officer was attempting to give the required warning to the driver, there was interference from a radio transmission on the police vehicle's radio which prevented a clear and intelligible warning, the court

found it was the police officer's own acts which induced the confusion. In this case, the police officer played no part in Hughey's accident and the ensuing head injuries. When the officer's action results in a failure properly to admonish the driver, the suspension is invalid not only because the refusal is excused but also because the statute requires proper admonitions be given. (§ 13353.)

The general statement of the rule is: "When there is no evidence of confusion, and where apparent confusion is not demonstrated and is not apparent to the arresting officer, no further clarification on the part of the arresting officer is required. [Citation.]" (*Cahall* v. *Department of Motor Vehicles* (1971) 16 Cal.App.3d 491, 497 [94 Cal.Rptr. 182].) Here, Officer Jeremica testified Hughey's response did not make any sense to him. A finder of fact could well have found it was not reasonable for him to consider the "fair meaning" of Hughey's response to be a refusal. (See *Maxsted, supra,* 14 Cal.App.3d at p. 986.)

If, in what we perceive to be an infrequent case, the driver is able to convince a trier of fact that he or she was incapable of refusing a test for reasons unconnected with the consumption of alcohol, the statute contemplates a restoration of the driver's license. We recognize that police officers are not infallible, that all detentions are not found to be lawful, all searches are not legal and all arrests do not result in convictions. Nor is the police officer a neurologist, a pyschologist or on-the-scene trauma specialist. While obvious incapabilities may be apparent to an arresting officer, incapability engendered by trauma wherein the symptoms are similar to those of intoxication will likely be missed by the officer absent a medical examination. If the driver presents expert testimony of his incapability to refuse a test which convinces the trier of fact, this is permitted under section 23157, subdivision (a)(5).

From our review of decisions of other jurisdictions which have implied-consent laws similar to our own, we find courts have reached similar conclusions though not dealing with the precise issue in this case. (See *Mercer* v. *Department of Motor Vehicles* (1991) 53 Cal.3d 753, 764-768 [280 Cal.Rptr. 745, 809 P.2d 404] [comparing California's statute to others]; 1 Loyola L.A. L.Rev. 23 (1968); Uniform Vehicle Code and Model Traffic Ordinance (1987) § 6-207.)

In *Stiles* v. *Commissioner of Public Safety* (Minn.Ct.App. 1985) 369 N.W.2d 347, the driver suffered injuries in a motorcycle accident, and the officer read the required admonishment while the driver was undergoing medical treatment. The Minnesota court held license suspension was improper, as the officer had not made a good faith effort to determine that the

driver was attentive, distinguishing a prior case. (*Ibid.*) The court noted that new legislation in Minnesota, providing that a person "who is unconscious or who is otherwise in a condition rendering the person incapable of refusal is deemed not to have withdrawn the consent," "addresses the concerns now before this court." (369 N.W.2d at p. 353.)

However, the new Minnesota statute did not address all of the issues in this area. In *Douglas* v. *Commissioner of Public Safety* (Minn.Ct.App. 1986) 385 N.W.2d 850, the court recognized "that ultimately the decision to invoke or not to invoke the provisions of [the 'incapable of refusal' statute] must be made by a peace officer upon consideration of subjective criteria and often under conditions of rapidly changing circumstances. Those subjective decisions, made in good faith, are often scrutinized in subsequent legal proceedings. It is impossible to fashion infallible guidelines. However, when, as here, the driver is receiving a multitude of emergency room treatment procedures necessitated by extensive and traumatic injury, the officer must seriously consider the applicability of [the statute] to the circumstances at hand.[3] Failure to do so may deny the Commissioner the ability to institute revocation procedures." (385 N.W.2d at pp. 853-854.) Footnote 3 states "If the officer is concerned about whether a blood test will further endanger an injured driver's physical condition, the officer should seek the opinion of the attending physician, rather than make a personal assessment of the situation." (*Id.* at p. 854, fn. 3.) Later Minnesota cases focus on whether the officer had reason to believe the driver was incapable of refusing because of his or her injuries. (See *Villeneuve* v. *Com'r of Public Safety* (Minn.Ct.App. 1988) 417 N.W.2d 304, 308; *Poppenhagen* v. *Commissioner of Public Safety* (Minn.Ct.App. 1987) 400 N.W.2d 799, 802.)

In Pennsylvania there is a line of cases which merely determine the adequacy of the driver's proof at the revocation hearing. "When a motorist does not suffer from any obvious inability to comply with an officer's request to submit . . . a finding that he or she was physically unable to make a knowing and conscious refusal must be supported by competent medical evidence. [Citation.]" (*Com., Dept. of Transp.* v. *Griffith* (116 Pa. Commw. 196 1988) [541 A.2d 66, 67].) The Pennsylvania courts have not addressed the issue presented herein. (See 4 Erwin, Defense of Drunk Driving Cases (3d ed. 1990) § 33.07 [7], pp. 33: 140-142, fn. 35 [collecting Pa. cases].)

Hughey observes that Illinois law is contra to his assertions. In *People* v. *Kirby* (1986) 145 Ill.App.3d 144 [99 Ill. Dec. 209, 495 N.E.2d. 656], the driver urged that the " 'dead, unconscious or . . . incapable of refusal' " statute "expressly provides for testing those who are incapable of refusal. Thus, the argument goes, where a suspected drunk driver is dazed or disoriented, the trial court should determine whether a 'meaningful refusal'

to undergo blood-alcohol testing was possible. If a meaningful refusal did not occur, the defendant concludes, there is no 'refusal' for the purpose of invoking the implied consent law's sanctions.

"We cannot accept the defendant's argument that a refusal to submit . . . must, in essence, be 'knowing.' Such a requirement does not comport with either the legislative intent underlying the statute . . . ." (495 N.E.2d at p. 658.)

*Kirby* goes on to explain that since the purpose of the law is to facilitate prosecution of drunk drivers, the proposed rule would permit intoxicated drivers to evade the test. "Although the present defendant's alleged inability to make a 'meaningful' refusal stems from his injuries rather than his apparent intoxication, the absurdity we would create by accepting his argument is no less real. For the statute to have any meaning, a police officer must be able to rely upon the objective fact of refusal without regard to a suspect's subjective intentions." (495 N.E.2d at p. 658.)

The harshness of this rule was somewhat ameliorated in *People* v. *Goodman* (1988) 173 Ill.App.3d 559 [123 Ill.Dec. 417, 527 N.E.2d 1055] where (527 N.E.2d at p. 1058) the court held an officer must have had probable cause to arrest the driver for drunk driving which, in the court's view, eliminates the problem of revoking licenses of drivers who are merely dazed and injured. The court did not consider the problem presented here, where the dazed and injured driver coincidentally exhibits symptoms of alcohol intoxication.

A paradigm of this problem of coincidental alcohol symptoms was presented in *Matter of Hansen* (S.D. 1979) 280 N.W.2d 110, where the evidence showed the driver, pinned in his car after a serious accident, drank brandy after the accident to relieve his pain. He had driven into a ditch and it was almost two hours until help arrived. (*Id.* at p. 111.) The trial court had found no probable cause to arrest existed. The appellate court disagreed but upheld the trial court's finding that Hansen " 'did not hear or understand the requested blood test; and therefore, did not refuse to take said blood test.' " (*Id.* at p. 113.) "The least that could be expected is that the officer consult with the doctor or nurses before attempting to interrogate Hansen as to a blood test." (*Ibid.*) Similarly, in *Matter of Krahn* (Okla. 1977) 569 P.2d 982, the driver had a concussion, but also exhibited symptoms of alcohol intoxication. (*Id.* at p. 983.) The court held the driver was "not mentally capable of refusing the chemical test." (*Id.* at p. 984.)

There is contrary authority. Some states deem the objective facts known to the officer to be controlling. (*Kirby, supra,* 495 N.E.2d at p. 658; *Mary* v. *Iowa Dept. of Transp.* (Iowa 1986) 382 N.W.2d 128, 132-133; *McDowell* v.

*Iowa Dept. of Transp., M.V.D.* (Iowa Ct.App. 1984) 356 N.W.2d 234, 236; *State* v. *Morgan* (1982) 198 Mont. 391 [646 P. 2d 1177, 1180] [officer believed driver incapable of refusing; court upheld admission of evidence of blood test over driver's claim he was conscious and should have been asked to submit]; *State* v. *Campbell* (1980) 189 Mont. 107 [615 P. 2d 190, 194-195] [same]. See *People* v. *Massong* (1984) 105 A.D.2d 1154 [482 N.Y.S.2d 601, 602] [driver appeared to be unconscious, since officer was not qualified to determine if the driver was faking, it was proper to take a blood sample].)

The rationale of these cases is the prevention of violent confrontations. "It was reasonable for the Legislature, concerned with avoiding potentially violent conflicts between the police and drivers arrested for intoxication, to provide that the police must request the driver's consent, advise him of the consequences of refusal and honor his wishes if he decides to refuse, but to dispense with these requirements when the driver is unconscious or otherwise incapacitated to the point where he poses no threat." *People* v. *Kates* (1981) 53 N.Y.2d 591 [444 N.Y.S.2d 446, 448-449, 428 N.E.2d. 852, 854]. See also *Bass* v. *Municipality of Anchorage* (Alaska Ct.App. 1984) 692 P.2d 961, 965; *Rossell* v. *City & Cty. of Honolulu* (1978) 59 Hawaii 173 [579 P.2d 663, 670-671].)

Washington makes a different tack. Washington's statutory exception for unconsciousness (Wn. Rev. Code, § 46.20.308(4)), refers to "Any person who is dead, unconscious, or who is otherwise in a condition rendering him or her incapable of refusal" and was interpreted in *Gibson* v. *Department of Licensing* (1989) 54 Wn.App. 188 [773 P.2d 110]. That court (at pp. 112-113) focused on the word "otherwise":

"The *ejusdem generis* rule requires that general terms appearing in a statute in connection with specific terms are to be given meaning and effect only to the extent that the general terms suggest items similar to those designated by the specific terms. In short, specific terms modify or restrict the application of general terms where both are used in sequence. [Citations.]

"[The statute] specifically mentions death and unconsciousness. Both death and unconsciousness are physical states that are readily discernable to an observer such as a police officer. In either condition an officer has the statutory authority to substitute a blood test for a breath test. [Citation.] Consequently, the ejusdem generis rule restricts the general phrase, 'or who is otherwise in a condition rendering him incapable of refusal,' to other *physical* conditions for which a blood test is authorized that, like death and unconsciousness, clearly appear to prevent a driver from responding to the officer's request. For instance, a driver might be covered within the general

phrase if s/he were conscious, but had sustained such severe mouth and facial injuries that s/he apparently could not speak or was apparently in such pain that communication was highly unlikely. [Citation.]" (Fn. omitted.)

A conscious driver in Washington is not "incapable" of refusing to submit unless the cause of the confusion is physically apparent. (See *State Dept. of Licensing* v. *Sheeks* (1987) 47 Wn.App. 65 [734 P.2d 24, 27 (maj. opn.), 31-32 (dis. opn.)].) However, our statute refers to "Any person who is unconscious or otherwise in a condition rendering him or her incapable of refusal," and the provision for dead motorists is made later in the statute. (§ 23157, subd. (a)(5).)

Hawaii has interpreted its statutory exception to apply "only where an arrestee *is absolutely incapable of manifesting, through words, acts, conduct* or other means, his willingness or unwillingness to submit to a test. Such a situation may arise, for example, where a driver . . . may be conscious but in shock as the result of serious injuries sustained in an automobile accident. The arrested driver may thus be totally unable to respond to a request by a police officer to submit to a breath or blood test." (*Rossell, supra*, 579 P.2d at p. 671.)

However, as noted by some courts the officer is not a medical expert. (*Massong, supra*, 482 N.Y.S.2d at p. 602.) In fact, Iowa requires a doctor to certify that a person is dead, unconscious or otherwise incapable of refusing prior to the administration of a chemical test. (*McDowell, supra*, 356 N.W.2d at p. 236.) One South Dakota case has stressed the importance of having an officer consult with a medical professional before making his or her decision. (*Matter of Hansen, supra*, 280 N.W.2d at p. 113.)

Other courts are in accord with our view. (*Higgins* v. *State, Dept. of Motor Vehicles* (1985) 101 Nev. 531 [706 P.2d 506, 508-509] [officer's subjective belief that driver refused to submit contradicted by competent medical evidence of incapacity]; *Krahn, supra*, 569 P.2d at p. 984 [same]; *State* v. *Hagaman* (1986 App.) 133 Wis.2d 381 [395 N.W.2d 617, 618] [applying similar rule, but driver failed to prove incapacity].)

Finally, in a dire prediction, the DMV contends the trial court's ruling in this case, if upheld, will lead to more violent confrontations between injured or drunken motorists and the police, citing to *Plunkett* v. *Alexis, supra*, 136 Cal.App.3d 370. In *Plunkett*, the driver urged the officer had a duty to force the driver to take a test due to his lack of capacity to refuse. This court held: "Here, although plaintiff was in pain, he expressly refused to take any test and indicated he understood what the officer was telling him. On

this record, for the officer to have forcibly administered a test would have been unnecessary and possibly dangerous for both parties." (*Id.* at p. 374.)

Hughey does not expressly urge the officer should have engaged in a violent struggle to obtain a blood sample. He posits that transporting him to a hospital or doctor would have enabled him to have a medical evaluation of his condition; and that he is statutorily empowered by section 23157, subdivision (a) to prove he was by reason of injuries, not induced or exacerbated by alcohol consumption, rendered incapable of refusing a test. We agree the statute grants such right.

We do not foresee that rejection of DMV's "reasonable police officer" theory will lead to the violent confrontations envisioned by DMV. As a practical matter, generally an officer faced with a refusal to submit will not analyze the motorist's capability to refuse to submit, but will instead assume it is a volitional act on the driver's part and rely on the sanction of license suspension to punish the recalcitrant motorist: The officer will take "no" to mean "no" and proceed accordingly.

From our review of the cases on the incapable-of-refusal exception, we do not find any bright-line rule contended for by the DMV that the triers of fact in an implied consent hearing may not consider a driver's capacity to refuse a test but must confine its inquiry to the reasonableness of the officer's actions. In this case substantial evidence supports the finding by the trial court that despite how the officer may have interpreted Hughey's remarks and conduct at the scene, his severe injuries rendered him incapable of refusing consent. The statute requires the court to deem such a driver not to have withdrawn his or her implied consent. The trial court properly issued the writ.

If remedial action is required, the Legislature is the proper body to deal with the problem presented herein. While it is unfair for a dazed and disoriented driver to lose his or her license because she or he was genuinely unable to understand what was happening, it may as well be perceived as unfair to permit drunken drivers and their expert witnesses to thwart the needs of the populace for safe streets. (See *South Dakota* v. *Neville* (1983) 459 U.S. 553, 558-559 [74 L.Ed.2d 748, 755, 103 S.Ct. 916].) The present statutory scheme may well be viewed as placing an unreasonable burden on police officers to determine whether a motorist involved in an accident is injured and belligerent, or merely drunk and belligerent.

One solution to be considered by the Legislature is to require officers to take all suspected drunk driving motorists to a hospital if there is serious head injury or other serious trauma. This would ensure prompt medical

treatment and would permit a determination of the motorist's ability to refuse to submit to be made by trained medical personnel. It would also eliminate most of the danger of hostile confrontations between motorists and the police, as most motorists, even belligerent ones, are not concerned about going to the hospital for a medical check-up. They are concerned about going to jail after the results of the blood, breath, or urine test are made known to the officer. To require an officer faced with a motorist with a head injury to take him or her to the hospital before providing the blood, breath, or urine admonitions would comport with due process and would satisfy the public policy already established in the statute.

### DISPOSITION

The judgment is affirmed.

Sims, J., concurred.

**PUGLIA, P. J.**—I concur. As I read the statute, it plainly contemplates that there may be occasions when "no" does not mean "no," i.e., when an express refusal to submit to a chemical test is not a withdrawal of the consent to such testing implied in the act of driving a motor vehicle. That is the effect of Vehicle Code section 23157, subdivision (a)(5) (hereafter section 23157) which reads in relevant part: "Any person who is unconscious *or otherwise in a condition rendering him or her incapable of refusal* is deemed not to have withdrawn his or her consent and a test or tests may be administered whether or not the person is told that his or her failure to submit to, or the noncompletion of, the test or tests will result in the suspension or revocation of his or her privilege to operate a motor vehicle. . . ." (Italics added.)

Serious injury to the head, even though not causing sustained unconsciousness, may nevertheless render the injured person incapable of refusal within the meaning of section 23157. In that circumstance, the determination whether an articulated refusal of a chemical test is volitional or not involves a medical judgment beyond the ken of the arresting officer. In most if not all such cases, however, the fact of head trauma, if not its effect on the injured individual, is objectively ascertainable by a trained officer through observable injury, the conduct of the accident victim, the surrounding circumstances or a combination of these.

Here the respondent lost control of his motorcycle while travelling at 45 miles per hour, was thrown off and crashed into a fence. He was not wearing a helmet. The arresting officer was informed of these facts when he arrived on the scene. He was also told by a witness that respondent had been

rendered unconscious for several minutes after the accident. When the officer talked to respondent, he was alternately responsive and irrational. A paramedic at the scene advised the officer that despite the lack of observable trauma to that area, injury to the head was a possibility. In his testimony at the administrative hearing, the officer acknowledged a possibility of head injury arose simply from the circumstances of the accident. He had been taught that persons suspected of sustaining head injury should be taken to a doctor. He had also been taught that some of the symptoms of head trauma are similar to those displayed by one under the influence. The officer formed the opinion the respondent was under the influence and arrested him for violation of Vehicle Code section 23152, subdivision (a).[1]

The officer did not secure medical treatment for respondent but took him to jail. There, respondent was advised of the consequences of refusal and asked to submit to a chemical test. Respondent replied, "I'm not taking any test—just let me go. I'll show you something too cool man." The officer took this for the refusal which it appeared on its face to be and, without attempting to administer a test as he might have done, relied instead on the sanction of license suspension under the implied consent law.

Few would argue with the officer's choice of remedies under these circumstances. Moreover, with the benefit of hindsight, few can fail to appreciate the dilemma in which the officer found himself. But it was a dilemma largely of his own making. Had the officer secured immediate medical treatment for respondent, as the objective circumstances and the officer's own training indicated he should have done, implementation of the implied consent law would likely have been informed and guided by expert medical judgment as to respondent's volitional capability and, if a chemical test was to be administered, the best way to proceed.

With nothing more than his own training and experience to rely on, an arresting officer is not capable of going behind a straightforward, express refusal to submit to chemical testing in order to calibrate its volitional quality. That is a matter for medical professionals. But trained officers, in the careful discharge of their duties, will appreciate the circumstances indicative of possible head injuries and, in acting to secure medical attention for the accident victim, consult with and benefit from the counsel of medical professionals. For those reasons, I do not share the Attorney General's concern that the interpretation of section 23157 which we adopt today

[1]The officer detected the odor of alcohol on respondent's breath, respondent staggered, his speech was slurred, his eyes were watery, bloodshot and demonstrated lateral nystagmus. These observations, in combination with the other information he acquired at the accident scene, gave the officer probable cause for the arrest. The fact remains, however, that an accident victim who is under the influence may also have sustained head injury.

(which by its terms we are obliged to do) will inevitably lead to more violent confrontations between officers and physically injured motorists suspected of driving under the influence.

However, a caveat is in order. If, consistent with section 23157, medical experts may now testify at administrative license suspension hearings that a licensee was rendered incapable of refusing a chemical test by virtue of physical trauma, can those experts who minister to psychological and emotional trauma be far behind? Unlike physical injury, as to the head, there are no reliable indicia of psychological trauma available to an officer in the field who suspects a motorist of driving under the influence. The officer can infer head injury from a bleeding, lacerated cranium or, as here, from the fact the unhelmeted accident victim careened head first into a fence. But how can he discern a psyche scarred by, e.g., schizophrenia, or draw an inference from a concatenation of personally devastating events (e.g., loss of job, dissolution of marriage) of which he is not even aware? It may be confidently anticipated that there are experts for hire who would opine, after the fact of course, that conditions such as these diminished or destroyed a motorist's volition.

Administrative hearings under the implied consent law are informal, and advisedly so. Greater formality would exact from the state and the litigants substantially additional time and expense multiplied by the large number of such hearings across the state. While informality may serve the public interest in the typical case, it does not necessarily do so in cases where incapacity to refuse testing is in issue. In the administrative hearing in this case, the only persons present were the respondent licensee, his counsel, the arresting officer and the hearing officer. Respondent produced as an expert witness a neurologist who testified essentially that respondent's head injuries rendered him incapable of refusing a chemical test. The neurologist was not subjected to cross-examination nor did the DMV offer expert testimony in rebuttal. From all that appears, DMV had no notice respondent would offer expert testimony on the issue of incapacity. To note that the testimony of respondent's expert was wholly unchallenged implies no opinion on its quality or character. But in matters as important as these the opportunity to challenge and to rebut should be available. That opportunity could be afforded by conditioning the use of expert testimony on the requirement of advance notice to DMV sufficient to allow DMV to involve counsel in the

proceedings and, if advised, to secure rebuttal testimony. Of course, such a requirement would have to be imposed by the Legislature.

A petition for a rehearing was denied November 22, 1991, and appellant's petition for review by the Supreme Court was denied February 13, 1992. Arabian, J., and Baxter, J., were of the opinion that the petition should be granted.