Filed 3/24/16 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>MARCUS ARREDONDO,<br><br>    Defendant and Appellant. | H040980<br>(Santa Clara County<br>Super. Ct. Nos. C1363765 &<br>C1365187)<br><br>ORDER MODIFYING OPINION<br>AND DENYING REHEARING<br><br>NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed herein on February 26, 2016 be modified as follows:

1.      On page 12, at the end of the second full sentence ending in "probation condition situation" add as footnote 8 the following footnote, which will require the renumbering of all subsequent footnotes:

[8] In its petition for rehearing, respondent contends that sufficient evidence of actual consent pursuant to section 13384 appears in the fact, as reported in Officer Valverde's entries on DMV forms, that defendant had applied for and obtained a California driver's license well after that statute took effect.  This may indeed support an inference of express prior consent pursuant to the statute, but we are not prepared to hold, without a full airing of the issue, that such evidence is *sufficient* to establish express consent for constitutional purposes without particularized evidence that defendant, himself, actually gave such consent.  Moreover, even if we deemed the record sufficient to establish the predicate fact, it would remain to be determined whether such advance blanket consent is constitutionally effective in present circumstances.  Since these issues have not

heretofore been addressed, we must hold that any claim of express consent pursuant to section 13384 has been procedurally forfeited. Nor do we believe, as respondent asserts, that the trial court "presumed on the record that appellant, having been licensed, had provided express consent." In making these remarks the court described itself as "playing devil's advocate." As explained in its written ruling, its finding of consent rested entirely on "implied" consent pursuant to section 23612. Section 13384 appears never to have been mentioned in this matter until we alluded to it here in hopes of alerting the bar and bench to its potential relevance.

2. On page 23, line 4, the sentencing starting with "Nothing in the record" continuing to the next full sentence ending with "to the hospital" are deleted and the following sentence is inserted it their place:

Casting further doubt on the accuracy of Officer Valverde's stated recollection are his statements prior to the suppression hearing to the effect that he had no independent recollection of relevant events, telling the prosecutor, " 'I don't even think I went to the hospital.' "

Respondent's petition for rehearing is denied.

No change in judgment.

Dated: _____
RUSHING, P.J.

WE CONCUR:

_____
MÁRQUEZ, J.

_____
GROVER, J.

2

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　　　v.<br><br>MARCUS ARREDONDO,<br><br>　　　Defendant and Appellant. | H040980<br>(Santa Clara County<br>Super. Ct. Nos. C1363765 &<br>C1365187) |

Marcus Arredondo pleaded no contest to drunk driving after the trial court denied his motion to suppress the results of a blood alcohol test. The chief question in the case is under what circumstances may authorities seize a blood sample from an unconscious person suspected of drunk driving without offending the Fourth Amendment's guarantee against unreasonable searches and seizures. The trial court found that a blood extraction was permissible, without a warrant or a showing of exigent circumstances, by virtue of California's "implied consent" law, which declares that one who drives a motor vehicle in this state is "deemed" to consent to blood alcohol testing. We hold that the consent imputed to drivers under such a law cannot by itself justify a seizure without a duly issued warrant. We find no error, however, in the trial court's ruling that the officer here reasonably relied on the statute in seizing defendant's blood without a warrant, bringing the case within the "good faith" exception to the exclusionary rule. On that basis we will affirm the conviction.

BACKGROUND

Testimony at the preliminary hearing established that shortly before 11:00 p.m. on April 29, 2013, defendant drove his Jeep Cherokee away from a social gathering at which he and some of his six passengers had been drinking. One of the passengers testified that after visiting a liquor store, defendant began to "drive crazy," ultimately causing the vehicle to flip over. Three passengers immediately left the scene. At least two of the remaining passengers were injured, one with a brain injury. Defendant was also injured, and was taken to Santa Clara Valley Medical Center where he was ultimately arrested and where a blood sample was drawn, disclosing a blood alcohol content of 0.08 percent. Defendant was unconscious when these events occurred.

Defendant was charged with one felony count of driving under the influence of alcohol or drugs, causing injury; one felony count of driving with a blood alcohol content of 0.08 percent, causing injury; and a misdemeanor count of driving without a license. Several enhancements were charged on the basis of the bodily injuries suffered by two passengers.[1]

Defendant filed a motion to suppress evidence derived from the warrantless extraction of his blood at the hospital. The prosecutor argued that the extraction was justified by (1) exigent circumstances, (2) statutorily implied consent, (3) the officer's good faith belief that the extraction was lawful in light of longstanding practice under prior caselaw; and (4) good-faith reliance on the implied consent statute.

At the hearing on the motion to suppress it was stipulated that no warrant had been issued. Officer Valverde testified that he had been dispatched to the scene of the accident at 11:05 p.m. to assist officers already there. He arrived at about 11:15 p.m. At least four

---

[1] A second complaint was filed on September 10, 2013, charging defendant with misdemeanor drunk driving on a subsequent occasion. That charge has no apparent bearing on any issue in this appeal.

or five other officers were already questioning potential witnesses, taking measurements, and so on. After Valverde had been on the scene for about 15 minutes, the officer in charge sent him to Santa Clara Valley Medical Center to keep track of defendant. Defendant had not yet been identified as the driver of the Jeep.

Officer Valverde testified that he arrived at the hospital around 11:39 p.m. Defendant was being treated in the trauma room for what were then considered life-threatening injuries. Valverde and another officer, who was there to assist him, stood by while medical personnel worked on defendant in the trauma room for about 45 minutes. During this time Valverde learned from other officers that defendant had been the driver. He was also told that a passenger had been seriously injured and that other passengers said defendant may have been drinking.

Around 12:23 a.m., defendant was transferred out of the trauma center into a room. Valverde testified that he arrested defendant at about 12:30 a.m. "for a felony DUI" based on reports by other officers that "another subject . . . had some injuries." When arrested, and throughout the time of Valverde's contact with him, defendant appeared to be unconscious.

After the arrest, Valverde's chief objective was to secure a blood draw. Around 12:30 a.m. he requested that a phlebotomist be dispatched to the hospital for that purpose. The phlebotomist arrived at about 1:05 a.m. Defendant was still unconscious. At this time Officer Valverde executed a form from the Department of Motor Vehicles (DMV) containing admonitions that would ordinarily be read to the arrestee if he or she were conscious. The phlebotomist drew defendant's blood, filled out a form attesting to the regularity of the extraction, and gave the blood to Valverde. He booked it into evidence, thereby completing his assignment in the case.

Officer Valverde testified that it was impossible to conduct a blood test during the 90 minutes following the accident "because of the medical situation that was going on."

3

Further delay after the arrest presented the risk that defendant's blood alcohol level could subside below the legal limit. Valverde had never before sought a search warrant by affidavit or telephone.

On March 14, 2014, defendant submitted a supplemental motion to suppress based mainly on dispatch records contradicting Officer Valverde's testimony concerning the time of arrest and of his first learning that defendant had been the driver. Specifically, Valverde's entries on a DMV form indicated that he arrested defendant at 11:30 or 11:35 p.m. This was consistent with radio transcripts indicating that at 11:36 p.m., a dispatcher broadcast that defendant was the driver of the Jeep. Valverde did not recall hearing this broadcast, or learning of defendant's driver status before 12:23 a.m., when he himself apparently reported on the police network that "Driver Arrendondo['s] [*sic*]" injuries were not life-threatening.

On March 20, 2014, the court denied the motion to suppress on the grounds that defendant had consented to the blood draw pursuant to California's implied consent statute, specifically Vehicle Code section 23612 (§ 23612), subdivisions (a)(1)(A) and (a)(5), and that even if this consent was not itself sufficient to excuse the lack of a warrant, Officer Valverde had relied in good faith on the statute. The court expressly rejected the prosecution contentions that the warrantless blood draw was justified by exigent circumstances and by reasonable reliance on judicial precedent that had only recently been abrogated when the blood draw occurred.

Defendant entered a plea of no contest to one count of injurious driving with a blood alcohol content of .08, as well as to the misdemeanor charge of driving without a license. The court suspended imposition of sentence and placed defendant on probation on the condition, among others, that he serve a jail sentence exceeded by custody credits he had already earned. Defendant filed this timely appeal.

4

## I. Introduction

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." (U.S. Const., 4th Amend.) The extraction of blood or other materials from a person's body for purposes of chemical testing constitutes a search and seizure for purposes of this guarantee. (*People v. Robinson* (2010) 47 Cal.4th 1104, 1119; see *Schmerber v. California* (1966) 384 U.S. 757, 770 (*Schmerber*).) The extraction here was conducted without a search warrant. The "basic rule" is that " 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.' " (*Arizona v. Gant* (2009) 556 U.S. 332, 338, quoting *Katz v. United States* (1967) 389 U.S. 347, 357.) In other words, a warrantless search, if not shown to fall within an exception, is "presumptively unreasonable" and hence violative of the constitutional guarantee. (*People v. Toure* (2015) 232 Cal.App.4th 1096, 1103.) The state bears the burden of establishing the constitutionality of a search conducted without a warrant. (*Coolidge v. New Hampshire* (1971) 403 U.S. 443, 454-455; *Badillo v. Superior Court* (1956) 46 Cal.2d 269, 272.) Thus, the burden here fell on the prosecution to establish an exception to the warrant requirement.

In reviewing the trial court's ruling on a motion to suppress, we defer to that court's findings of fact insofar as they are supported by substantial evidence, but we independently review its selection of applicable rules and its application of those rules to the facts. (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 364-365.)

## II. Statutory Implied Consent

The trial court found that the warrantless search here was justified on grounds of consent. This is one of the "established exceptions" to the warrant requirement.

5

(*Schneckloth v. Bustamonte* (1973) 412 U.S. 218, 219 (*Schneckloth*); see *id.* at p. 222 ["a search authorized by consent is wholly valid"]; *People v. Michael* (1955) 45 Cal.2d 751, 753 ["if [defendant] freely consents to an entry or search . . . , his constitutional rights are not violated and any search or taking of evidence pursuant to his consent is not unreasonable"]; *People v. Mason* (1971) 5 Cal.3d 759, 765, quoting *Katz v. United States*, *supra*, 389 U.S. 347, 358, fn. 22 [" 'A search to which an individual consents meets Forth Amendment requirements . . . .' "].)  To establish this exception, the state must prove "that the consent was, in fact, freely and voluntarily given."  (*Bumper v. North Carolina* (1968) 391 U.S. 543, 548; see *Schneckloth*, *supra*, at p. 223.)  Most commonly this question turns on whether the person searched in fact manifested consent to the search and whether, in view of "the totality of all the circumstances," that consent "was in fact 'voluntary' or was the product of duress or coercion, express or implied." (*Schneckloth*, *supra*, at p. 227.)

Here defendant was unconscious at the time of the seizure and thus incapable of manifesting consent voluntarily or otherwise.  This distinguishes the case from the more common situation in which a defendant manifests actual consent to a blood draw, but later contends the consent was vitiated by coercion.  (See, e.g., *People v. Harris* (2015) 234 Cal.App.4th 671, 679; *State v. Padley* (Wis. App. 2014) 354 Wis.2d 545, 580-587 [849 N.W.2d 867, 884-887].)  Defendant gave no colorable actual consent, ostensible or otherwise, at the time his blood was drawn.  The trial court's ruling rested on the premise that he had consented to such a search *in advance* solely by operation of the statute, which declares that anyone who drives a vehicle in this state is "*deemed* to have given his or her consent" to blood alcohol testing under specified conditions (Veh. Code, § 23612, subd. (a)(1)(A), italics added (§ 23612(a)(1)(A))), and that an unconscious person "is deemed not to have withdrawn his or her consent" to such testing (Veh. Code, § 23612,

6

subd. (a)(5) (§ 23612(a)(5)).[2] By virtue of these provisions, the trial court concluded, defendant's driving a vehicle provided "consent[] to the blood draw" such that "no search warrant was required."

There is no doubt that an advance blanket consent to search may be effective to waive Fourth Amendment protections in some circumstances. Most familiarly, a search may be upheld as consensual where it conforms to consent previously given as a *condition of probation* following conviction of an earlier crime. These cases rest on the

---

[2] As pertinent here, section 23612 provides:

"(a)(1)(A) A person who drives a motor vehicle is deemed to have given his or her consent to chemical testing of his or her blood or breath for the purpose of determining the alcoholic content of his or her blood, if lawfully arrested for an offense allegedly committed in violation of Section 23140, 23152, or 23153. . . .

"[¶] . . . [¶]

"(D) The person shall be told that his or her failure to submit to, or the failure to complete, the required chemical testing will result in a fine, mandatory imprisonment if the person is convicted of a violation of Section 23152 or 23153, and (i) the suspension of the person's privilege to operate a motor vehicle for a period of one year, (ii) the revocation of the person's privilege to operate a motor vehicle for a period of two years . . . , or (iii) the revocation of the person's privilege to operate a motor vehicle for a period of three years . . . .

"[¶] . . . [¶]

"(4) The officer shall also advise the person that he or she does not have the right to have an attorney present before stating whether he or she will submit to a test or tests, before deciding which test or tests to take, or during administration of the test or tests chosen, and that, in the event of refusal to submit to a test or tests, the refusal may be used against him or her in a court of law.

"(5) A person who is unconscious or otherwise in a condition rendering him or her incapable of refusal is deemed not to have withdrawn his or her consent and a test or tests may be administered whether or not the person is told that his or her failure to submit to, or the noncompletion of, the test or tests will result in the suspension or revocation of his or her privilege to operate a motor vehicle . . . ."

rationale that a probationer can effectively waive the full protection of the Fourth Amendment in order to avoid the greater curtailment of liberties flowing from a denial of probation. (See *People v. Robles* (2000) 23 Cal.4th 789, 795 ["[A] person may validly consent in advance to warrantless searches and seizures in exchange for the opportunity to avoid serving a state prison term."]; *People v. Mason, supra,* 5 Cal.3d 759, 766 ["[W]hen defendant in order to obtain probation specifically agreed to permit at any time a warrantless search of his person, car and house, he voluntarily waived whatever claim of privacy he might otherwise have had."]; cf. *id.* at p. 763, fn. 1 ["Although it could be argued that defendant impliedly consented to the search by not objecting to it, it is unnecessary to reach that question in view of our determination that the probation condition authorized a search even in the absence of defendant's consent thereto."]; cf. *id.* at p. 770 (dis. opn. of Peters, J.) [describing consent theory as "manifest fiction"]; *People v. Bravo* (1987) 43 Cal.3d 600, 605, quoting *People v. Myers* (1972) 6 Cal.3d 811, 819 [while Fourth Amendment rights "may be waived, 'the waiver must appear of record to have been knowingly and intelligently made' "].)

We do not believe the rationale for these searches can be readily extended to the present context. A criminal defendant is explicitly told of, and agrees to accept, the conditions imposed upon his or her enjoyment of the privilege the state grants him by withholding the prescribed punishment for his offense.[3] As discussed in greater detail

_____

[3] In contrast, search conditions imposed in connection with a grant of *parole* are not based on consent, and "[t]he consent exception to the warrant requirement may not be invoked" to validate them, because "parole is not a matter of choice." (*People v. Reyes* (1998) 19 Cal.4th 743, 749.) Similarly, because a juvenile offender "has no choice whether or not to accept a condition of probation that subjects him to a warrantless search," a search pursuant to such a condition cannot be upheld on grounds of consent. (*In re Tyrell J.* (1994) 8 Cal.4th 68, 83, overruled on another ground in *In re Jaime P.* (2006) 40 Cal.4th 128, 139; cf. *In re Curtis T.* (1989) 214 Cal.App.3d 1391, 1397 [entry into juvenile's bedroom, where stolen property found, was authorized under "access condition" of "home supervision agreement" signed by minor and parent].)

below, no such actual notice or agreement can be found as to many drivers on California roads. We recognize that driving on the public ways has also been characterized as "a privilege subject to reasonable regulation, under the police power, in the interest of the public safety and welfare." (*Watson v. Division of Motor Vehicles* (1931) 212 Cal. 279, 283.) But the state's power to place conditions on the exercise of that privilege cannot justify constitutional intrusions of the same magnitude as those permitted in granting probation. After all, the alternative to probation is confinement in prison, a severe curtailment of numerous rights and liberties enjoyed by persons who have not been convicted of crimes. A grant of criminal probation is thus an " 'act of clemency and grace' " on the part of the state, in exchange for which the defendant may justly be required to assent to lesser infringements upon his or her liberties. (*People v. Anderson* (2010) 50 Cal.4th 19, 32.) The operation of a vehicle can hardly be viewed in a similar light, for it is doubtful that the state has the power to flatly prohibit its citizens from driving, and their doing so is not so much an act at the state's sufferance as one in which they are entitled to engage subject to reasonable regulation. (See *People v. Hyde* (1974) 12 Cal.3d 158, 162, fn. 2, quoting *United States v. Kroll* (8th Cir. 1973) 481 F.2d 884, 886 [" 'Compelling the defendant to choose between exercising Fourth Amendment rights and his right to travel constitutes coercion; the government cannot be said to have established that the defendant freely and voluntarily consent[ed] to the search when to do otherwise would have meant foregoing the constitutional right to travel.' "]; see *Missouri v. McNeely* (2013) 569 U.S. ___, ___ [133 S.Ct 1552, 1565] (*McNeely*) ["the fact that people are 'accorded less privacy in . . . automobiles because of th[e] compelling governmental need for regulation,' . . . does not diminish a motorist's privacy interest in preventing an agent of the government from piercing his skin"].)

There is no need to pursue this analysis further, however, because the probation search cases rest on the premise that the probationer, in accepting a search condition,

9

"truly consents" to the resulting diminution in Fourth Amendment rights. (*Tyrell*, *supra*, 8 Cal.4th at p. 81.) Nothing comparable can be said of a driver to whom consent is *imputed* by the implied consent law. Indeed, "implied consent" is a misleading, if not inaccurate, label in this context. Certainly consent sufficient to sustain a search may be "implied" as well as explicit, but it is nonetheless *actual* consent, "implied" only in the sense that it is manifested by *conduct* rather than words. (See *People v. Superior Court* (2012) 204 Cal.App.4th 1004, 1012 ["consent to enter and search may be express or implied, and may be demonstrated by conduct as well as words"].) For example, in *People v. Frye* (1998) 18 Cal.4th 894, 990, overruled on another point in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22, the defendant's cohabitant impliedly consented to officers' entry when, in response to their question "who had hurt her," she "stepped back and pointed to defendant lying on the couch inside, letting officers step into the apartment to see who she was pointing at." Similarly, the defendant in *People v. Harrington* (1970) 2 Cal.3d 991, 995, stepped aside and held out his arm as an officer walked through the front door. The doctrine is traceable at least as far back as *People v. Wright* (1957) 153 Cal.App.2d 35, 40-41, where the defendant, by inviting officers into his house and leading them to a room containing contraband, waived any objection to a warrantless seizure.

To borrow terminology from the law of contracts, the consent in these and similar cases is implied "in fact," not "in law."[4] It is inferred from conduct constituting an *actual*

---

[4] An "implied-in-fact" contract is an actual agreement manifested not in words, but in the parties' conduct. (Black's Law Dict. (10th ed. 2014) p. 394, col. 2 ["A contract that the parties presumably intended as their tacit understanding, as inferred from their conduct and other circumstances."].) An "implied-in-law" contract, however, is not a real contract at all, but a "quasi-contract" *imposed* upon a party to remedy unjust enrichment or other inequity. (*Ibid.* ["An implied-in-law contract is not actually a contract, but instead is a remedy that allows the plaintiff to recover a benefit conferred on the defendant."]; *Arcade County Water Dist. v. Arcade Fire Dist.* (1970) 6 Cal.App.3d 232, 236 ["actually not a contract at all, but merely an obligation imposed by the law to

*manifestation* of consent.  Nothing here resembles this "implied consent."  The mere operation of a motor vehicle is not a manifestation of *actual* consent to a later search of the driver's person.  To declare otherwise is to adopt a construct contrary to fact.  Indeed this view of the statute is implicit in its own language—in particular, its declaration that driving is "deemed" to constitute consent.  (§ 23612(a)(1)(A).)  When a legal rule is stated in the form "A is deemed to be B," it means that A must be *treated as* B for purposes of the rule, even though *they are not the same thing*.  (See Black's Law Dict. (10th ed. 2014) p. 504, col. 2 [defining "deem" as "[t]o treat (something) as if (1) it were really something else, or (2) it has qualities that it does not have"].)  It " 'has been traditionally considered to be a useful word when it is necessary to establish a *legal fiction* either positively by *"deeming" something to be what it is not* or negatively by "deeming" something not to be what it is . . . .' "  (*Ibid.*, quoting G.C. Thornton, Legislative Drafting (4th ed. 1996). p. 99, italics added.)  Or as Mr. Justice Cave wrote of an English statute, "When you talk of a thing being deemed to be something, you do not mean to say that it is that which it is to be deemed to be.  It is rather *an admission that it is not what it is to be deemed to be*, and that, notwithstanding it is not that particular thing, nevertheless, for the purposes of the Act, it is to be deemed to be that thing."  (*The Queen v. County Council of Norfolk* (1891) 60 Q.B. 379, 380-381,[5] italics added.)[6]

---

bring about justice"]; 1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 1013, p. 1102, italics omitted ["The quasi-contract, or contract 'implied in law,' is an obligation (not a true contract . . .) created by the law without regard to the intention of the parties . . . ."].)

[5]  Available at <https://books.google.com/books?id=U9UfAQAAMAAJ&pg=PA379&lpg=PA379&dq=queen+v.+norfolk+county+1891&source=bl&ots=Ebf5e_Cu0x&sig=U3j4eRYLoukand4eTPTNojsKCGU&hl=en&sa=X&ved=0CCUQ6AEwAWoVChMIhreL-eX-xwIVVjSICh3s0QOJ#v=onepage&q=queen%20v.%20norfolk%20county%201891&f=false> (as of Feb. 24, 2016).

11

It bears noting that since 1999, California drivers applying for or renewing a license have been required to give their *express* consent to blood alcohol testing.[7] Proof of such consent by defendant here would at least have brought the case closer to the probation condition situation. But the express consent thus presumably given would not reach persons driving without a California license. A sizable proportion of California drivers fit this description. (See Veh. Code, § 14607.4 [legislative findings].) And of course, no out-of-state driver is reached by such a regime. It may be for this reason that the Legislature elected to simply "deem" the *act of driving*, in and of itself, legally equivalent to consent. The consent thus imputed comes into being the moment an Arizona driver crosses the Colorado River on the way to Los Angeles, or an Oregon driver crosses the 42nd parallel on the way to San Francisco. (See *Serenko v. Bright* (1968) 263 Cal.App.2d 682, 687 ["It is not the act of obtaining a driver's license which

---

[6] Nor is the California Legislature a stranger to this understanding of "deem." When contemplating a proposed statute that "deemed" the possession of certain chemicals to be possession of controlled substances, a legislative committee report observed that the statute would make possession of one "legally equivalent" to possession of the other. (Sen. Com. on Criminal Procedure, Rep. on Sen. Bill No. 419 (1995-1996 Reg. Sess.) Mar. 21, 1995, p. 6 [discussing proposed amendment to Health & Saf. Code, § 11383, subd. (f)].) To say that two things are "legally equivalent" is to acknowledge that they are not equivalent in fact.

[7] Vehicle Code section 13384 provides in part: "(a) The department shall not issue or renew a driver's license to any person unless the person consents in writing to submit to a chemical test or tests of that person's blood, breath, or urine pursuant to Section 23612, or a preliminary alcohol screening test pursuant to Section 23136, when requested to do so by a peace officer.

"(b) All application forms for driver's licenses or driver's license renewal notices shall include a requirement that the applicant sign the following declaration as a condition of licensure:

" 'I agree to submit to a chemical test of my blood, breath, or urine for the purpose of determining the alcohol or drug content of my blood when testing is requested by a peace officer acting in accordance with Section 13388 or 23612 of the Vehicle Code.' "

12

brings the statute into play, but instead the act of driving a motor vehicle upon a California highway"].)  But in contrast to a licensee who signs the statement described above, these drivers cannot be argued to have consented *in fact* to a search of their persons.  They have not been asked to agree, or told that they have a choice, or apprised of the consequences that will flow from their conduct.  (Cf. *People v. Reyes*, *supra*, 19 Cal.4th 743, 749 ["Without choice, there can be no voluntary consent to inclusion of [a] search condition."]; *People v. Baker* (2008) 164 Cal.App.4th 1152, 1160, citing *State v. Suazo* (1993) 133 N.J. 315, 627 A.2d 1074, 1078 ["assent to search is meaningless unless consenting party understands right to refuse consent"]; *Katz v. United States*, *supra*, 389 U.S. 347, 358, fn. 22, and accompanying text, quoting *Lopez v. United States* (1963) 373 U. S. 427, 463 (dis. opn. of Brennan, J.) ["the very nature of electronic surveillance precludes its use pursuant to the suspect's consent" because it " 'depends on lack of notice to the suspect' "].)  The statute makes their conduct the legal equivalent of consent regardless of their knowledge, intentions, or understanding.[8]

Obviously consent of this kind cannot be characterized as "free[]" (*People v. Michael*, *supra*, (1955) 45 Cal.2d 751, 753), or " 'knowingly and intelligently made' " (*People v. Bravo, supra,* 43 Cal.3d 600, 605, quoting *People v. Myers, supra,* 6 Cal.3d 811, 819.)  It cannot be "voluntarily given."  (*Bumper v. North Carolina*, *supra*, 391 U.S.

_____

[8]  Anticipating this point, one court has observed that "drivers are presumed to know the law."  (*People v. Superior Court* (*Harris*) (2014) 225 Cal.App.4th Supp. 1, 9 (*Harris I*), citing *Murphy v. Clayton* (1896) 113 Cal. 153, 161; *People v. Munroe* (1893) 100 Cal. 664, 670; *Bank One Texas v. Pollack* (1994) 24 Cal.App.4th 973, 981.)  This is a way of saying that the relevant mental condition—whether knowledge or consent—is *imputed* to the subject *by operation of law*.  (*Bank One Texas*, *supra*, at p. 981, citing *People ex rel. Mosk v. Lynam* (1967) 253 Cal.App.2d 959, 968 [effect of rule is to "charge[]" persons with knowledge of at least some legal principles pertinent to their affairs].)  This is equivalent to saying that person are "deemed" to have such knowledge.

543, 548, fn. omitted.)  For the same reason, it can never be tested for "duress or coercion."  (*Schneckloth*, *supra*, 412 U.S. at p. 227.)  In short, it is not real consent.

In support of its contrary conclusion, the trial court cited *Hughey v. Dept. of Motor Vehicles* (1991) 235 Cal.App.3d 752, 757 (*Hughey*).  But that case was concerned only with the *forfeiture of driving privileges* pursuant to the implied consent law upon a *refusal to submit* to a duly requested blood draw.  As the court observed, the statute was intended to "permit a driver to refuse to be tested," while "exact[ing] a penalty for refusal."  (*Id.* at p. 757.)  "The immediate purpose of this statutory scheme is to provide an *incentive for voluntary submission* to the chemical test and to eliminate the potential for violence inherent in forcible testing.  [Citation.]  The ultimate purpose is to deter drinkers from driving, thereby reducing the carnage on our highways.  [Citation.]"  (*Ibid.*, italics added.)  The statute grew out of a legislative perception that while forcible blood draws were lawful, " 'such an episode remains an unpleasant, undignified and undesirable one.' [Citation.]"  (*Hernandez v. Department of Motor Vehicles* (1981) 30 Cal.3d 70, 77.)  Therefore, "the Legislature sought to obviate these consequences for the driver and 'avoid the possible violence which could erupt if forcible tests were made upon a recalcitrant and belligerent inebriate' [citation], while at the same time preserving the state's strong interest in obtaining the best evidence of the defendant's blood alcohol content at the time of the arrest.  Thus, 'the Legislature devised an additional or alternative method of compelling a person arrested for drunk driving to submit to a test for intoxication, by providing that such person will lose his automobile driver's license for a period of six months if he refuses to submit to a test for intoxication.  The effect of this legislation is to equip peace officers with an instrument of enforcement not involving physical compulsion.' [Citation.]"  (*Ibid.*; see *Quintana v. Municipal Court* (1987) 192 Cal.App.3d 361, 368 [statutory purpose "is obviously thwarted by the inebriated driver

14

who refuses the test," thereby compelling officers "to risk the possible violence of a forcible test or to forego the best evidence of intoxication"].)

Toward these ends the statute posits a "deemed" consent on the part of all drivers (§ 23612, subd. (a)(1)) and then imposes administrative penalties, as well as enhanced punishment for any qualifying criminal conviction, on one who "refuses . . . to submit to, or fails to complete," the test to which the driver is already deemed to have consented. (Veh. Code, § 13353, subd. (a) [suspension or revocation of license, depending on prior offenses]; see *id*., subd. (b) [lifetime disqualification from driving for refusal on second occasion]; *id.,* § 23577 [mandatory "imprisonment . . . in the county jail" for conviction following willful refusal of request]; *id*., §§ 23538, subdivision (a)(1), 23577, subd. (a)(1) [mandatory fine].) Of course, to be effective an incentive or deterrent must be known to the actor. Therefore, the statute directs officers to tell the driver "that his or her failure to submit to . . . the required chemical testing will result in a fine, mandatory imprisonment if . . . convicted of a violation of Section 23152 or 23153," as well as suspension of driving privileges. (Veh. Code, § 23612, subd. (a)(1)(D).) A driver must also be informed of a consequence arising entirely outside the act, i.e., that evidence of a refusal to submit "may be used against him or her in a court of law." (Veh. Code, § 23612, subd. (a)(4); see *South Dakota v. Neville* (1983) 459 U.S. 553, 564.) Such a warning is required only by the statute—not by constitutional jurisprudence. (*South Dakota v. Neville*, *supra*, at pp. 565-566.)

A state legislature does not have the power to "deem" into existence "facts" operating to negate individual rights arising under the federal constitution. (See U. S. Const., art. VI, cl. 2 [supremacy clause]; *Marbury v. Madison* (1803) 5 U.S. 137, 177-180; *Younger v. Harris* (1971) 401 U.S. 37, 52 ["a statute apparently governing a dispute cannot be applied by judges, consistently with their obligations under the Supremacy Clause, when such an application of the statute would conflict with the Constitution"].)

15

A statute attempting such a feat would be a "nullity." (*Gibbons v. Ogden* (1824) 22 U.S. 1, 210-211.) Nor did the court in *Hughey* suggest otherwise. Again, it was solely concerned with the *administrative* consequences of refusal to consent. The question was whether the Department of Motor Vehicles had properly *revoked a driver's license*, based on express refusal to consent, where—as the trial court had found—the driver's capacity to refuse (or consent) had been impaired " 'by reason of [a] head trauma.' " (*Hughey, supra,* 235 Cal.App.3d at p. 754.) The case presented no occasion to consider any constitutional issue, and the court did not purport to do so.

It is against this same administrative background that we must understand the statute's declaration that a driver who is unconscious or otherwise "incapable of refusal" cannot be found to have refused consent, and is "deemed" not to have done so. (§ 23612, subd. (a)(5).) In those circumstances the statute permits a blood draw without the driver's cooperation. (*Ibid*. ["a test or tests may be administered whether or not the person is told that his or her failure to submit to, or the noncompletion of, the test or tests will result in the suspension or revocation of his or her privilege to operate a motor vehicle"].) But it does not purport to make the results of such a test *admissible in a criminal prosecution* without a warrant or proof of circumstances establishing an exception to the warrant requirement. In contrast, such results may be admissible in administrative license revocation proceedings whether or not the dictates of the Fourth Amendment have been observed. (See *Park v. Valverde* (2007) 152 Cal.App.4th 877, 887.)

We are aware of two other published decisions that might be cited to support the conclusion of the court below. The earliest, not cited by the parties, is *People v. Bloom* (1983) 142 Cal.App.3d 310. The arresting officer there testified that the defendant had responded to a request for a blood sample by saying, " 'Sure, I'll give you a blood sample.' " (*Id.* at p. 315.) Not surprisingly, the court sustained a finding of actual

16

consent. It then issued the dictum that "admission of the blood sample into evidence would have been proper even without the court's finding of express consent, since the taking of the blood sample was permissible under California's 'implied consent' law." (*Id.* at p. 316, fn. omitted.) In support of this assertion the court cited *People v. Superior Court (Hawkins)* (1972) 6 Cal.3d 757 (*Hawkins*), and *Schmerber, supra,* 384 U.S. 757. Neither case stands for the proposition thus attributed to it. Indeed the *Hawkins* decision tends to rebut that proposition. The trial court there had granted a motion to suppress after finding that the defendant's *signature on a consent form* had not been "freely and voluntarily given." (*Hawkins, supra,* at p. 761.) This finding was supported by substantial evidence (*ibid.*), and so the question became whether the search fell within another exception to the warrant requirement—specifically, the exceptions found in *Schmerber* and *People v. Duroncelay* (1957) 48 Cal.2d 766. (*Hawkins*, *supra*, at p. 761.) For reasons not relevant here, the court concluded that it did not, and affirmed the ruling suppressing the evidence. (*Id.* at p. 766.) Obviously, the implied consent statute would have dictated a different result if the consent imputed by that statute had been sufficient to sustain a warrantless search. But the *Hawkins* court alluded to the statute only as "instructive" of the "extreme measures" to which society was compelled to resort by "the shocking number of injuries and deaths on the highways caused by drunk drivers." (*Id.* at pp. 764, 765.) Nothing in the decision so much as hints that the statute could be thought to furnish, in and of itself, an exception to the warrant requirement.

Despite its unexplained reference to the implied consent law, the dictum in *Bloom* is best understood as resting on *Schmerber* and *Duroncelay* as interpreted in *Hawkins*. None of those cases purported to decide anything about consent, express or implied—let alone statutorily *imputed* consent. In each of them the rendering court assumed the *absence* of consent. (See *Duroncelay*, *supra*, 48 Cal.2d at p. 770 ["Under the circumstances, a finding that defendant consented is unwarranted, and we must therefore

17

determine whether the results of the blood test were admissible in the absence of defendant's consent to the taking of the sample."]; *Hawkins*, *supra*, 6 Cal.3d at p. 766 ["there is substantial evidence in the record to support the trial court's finding that defendant did not freely and voluntarily consent to the taking of his blood"]; *Schemerber*, *supra*, 384 U.S. at page 759 [defendant refused to consent "on the advice of his counsel"].)

Just as the *Bloom* dictum appears divorced from then-existing precedent, so too it has gone almost entirely unremarked in subsequent decisions. We have found no published authority citing it for the proposition that the implied consent law by itself furnishes a sufficient answer to a Fourth Amendment objection. To the extent the case stands for that proposition, we decline to follow it.

More recently, in *Harris*, *supra*, 225 Cal.App.4th Supp. 1, 8-9 (*Harris I*), the court seemed to adopt a view of the implied consent law resembling the dictum in *Bloom*, albeit without citing that case.[9] The defendant in *Harris I*, according to the arresting officer, had said " 'okay' " when "advised . . . pursuant to the implied consent law that he was required to take a blood test." (*Id.* at p. 4.) The trial court denied a motion to suppress on the ground "that the blood draw was authorized under the implied consent law." (*Ibid.*) The Appellate Division affirmed, stating that "implied consent is legally effective consent, at least so long as the arrestee has not purported to withdraw that consent." (*Id.* at p. 8.) Citing probation condition cases, the Appellate Division stated that "consent is not invalid under the Fourth Amendment simply because it was given in advance and in exchange for a related benefit, and this is all the implied consent law

---

[9] The desuetude of *Bloom* is reflected not only in the *Harris* court's failure to cite it, but in that court's assertion that "[n]o California court" had theretofore "expressly considered the question of whether chemical tests taken pursuant to the implied consent law are justifiable under the Fourth Amendment as consent searches." (*Harris I*, *supra*, 225 Cal.App.4th Supp. at p. 6.)

18

accomplishes." (*Ibid*., citing *People v. Bravo, supra,* 43 Cal.3d 600, 608; *Tolces v. Trask* (1999) 76 Cal.App.4th 285, 290; *Troppman v. Valverde* (2007) 40 Cal.4th 1121, 1125, 1139.)  It concluded that "motorists freely consent for Fourth Amendment purposes to chemical testing in accordance with the terms of the implied consent law, in exchange for the privilege of using the roads." (*Harris I, supra,* 225 Cal.App.4th at p. 9.)

The Appellate Division found support for this view in *McNeely*, *supra*, 569 U.S. ___ [133 S.Ct 1552], which overturned what had long been understood in this state to be the rule dictated by the Fourth Amendment, i.e., that involuntary blood draws from drunk driving arrestees are more-or-less categorically excepted from the warrant requirement because they inherently involve exigent circumstances.  (See pt. III, *post*.)  Nothing in *McNeely* suggests that statutory implied consent is by itself a sufficient basis to forego a warrant.  In the passage cited in *Harris I*, the *McNeely* court addressed an argument that to require a case-by-case demonstration of exigent circumstances would "undermine the governmental interest in preventing and prosecuting drunk-driving offenses." (*McNeely*, *supra*, ___ U.S. at p. ___ [133 S.Ct. at p. 1566].)  The court cited the states' implied consent laws as an example of the "broad range of legal tools" states have "to enforce their drunk-driving laws and to secure BAC evidence without undertaking warrantless nonconsensual blood draws." (*Ibid*.)  Those laws, explained the court, "require motorists, as a condition of operating a motor vehicle within the State, to consent to BAC testing if they are arrested or otherwise detained on suspicion of a drunk-driving offense." (*Ibid*.)  The laws also "impose significant consequences when a motorist withdraws consent; typically the motorist's driver's license is immediately suspended or revoked, and most States allow the motorist's refusal to take a BAC test to be used as evidence against him in a subsequent criminal prosecution." (*Ibid*.)  The court did not suggest that a statute explicitly *imputing* consent to drivers—as California's does—would sustain a warrantless blood draw of its own force.  Nor did the court address the effect of such laws on the

19

Fourth Amendment rights of a driver who is unconscious or otherwise incapable of either consenting or refusing to consent.

In any event, *Harris I* was substantially weakened as authority when the Fourth District accepted transfer and affirmed the result on a substantially narrower ground than the appellate division had adopted.[10] (*People v. Harris*, *supra*, 234 Cal.App.4th 671, review den. Jun. 10, 2015 (*Harris II*).) The court first held that the defendant had *actually* consented to the search when he "freely and voluntarily agreed to submit to a blood draw" following his arrest. (*Id.* at p. 682, see 689, fn. omitted ["a motorist's submission to a chemical test, if freely and voluntarily given, is actual consent under the Fourth Amendment"].) The court also held, in the alternative, that the blood draw was taken in good faith reliance on binding appellate precedent in effect before *McNeely*, which was only decided after the search there took place. (*Id.* at p. 703, see 677.)

If imputed consent is to be held sufficient to sustain a warrantless search, the holding will have to come from a court other than this one. We fear the Fourth Amendment could be left in tatters by a rule empowering the state to predicate a search on conduct that does not in fact constitute a manifestation of consent but is merely "deemed" to do so by legislative fiat. It is far from implausible, for example, that a legislative body—state or federal—might decree, in the name of public safety or national security, that the use of the mails, or the phone lines, or the internet—all of which rely to a greater or lesser extent on publicly owned property or facilities or publicly provided services—constitutes consent to search the contents of all communications thus

---

[10] Indeed the Fourth District did not acknowledge the appellate division's proposed categorical exemption based on imputed consent, instead construing that decision to rest on the premise that "actual consent to a blood draw pursuant to the informed consent law is freely and voluntarily given notwithstanding that the motorist gives consent in the face of administrative and criminal penalties for refusing to consent." (*Harris II*, *supra*, 234 Cal.App.4th at p. 681, citing *Harris I*, *supra*, 225 Cal.App.4th Supp. at p. 8-10.)

conducted. Consent to search homes might be "deemed" to be given by anyone taking advantage of various publicly provided or subsidized privileges—like use of public utilities, libraries, or schools. Consent to search the person might be "deemed" to be given by use of a public sidewalk or occupancy of a public place.

Any journey down that path should be preceded by considerably more reflection and circumspection than we find in *Harris I*. Lest we lose sight of the competing considerations actually at stake, it bears emphasis that we are not holding that defendant could not be searched—only that he could not be searched *without a warrant*, unless he were shown to have *actually* consented to the search by word or deed, or the state established some other exception to the warrant requirement. The state is never powerless to secure a blood sample from a nonconsenting drunk driving suspect whose blood is reasonably believed to constitute evidence of driving under the influence. (See Pen. Code, § 1524, subd. (a)(13) [authorizing warrant "[w]hen a sample of the blood of a person constitutes evidence that tends to show a violation of Section 23140, 23152, or 23153 of the Vehicle Code and the person from whom the sample is being sought has refused an officer's request to submit to, or has failed to complete, a blood test as required by Section 23612 of the Vehicle Code"].) All our holding means is that in the absence of facts sufficient to establish *actual* consent, or some other exception to the rule, the seizure must be supported by a duly issued warrant.[11]

---

[11] Our conclusion is supported by the preponderance of authority from other jurisdictions. (E.g., *State v. Butler* (Ariz. 2013) 302 P.3d 609, 613; *Williams v. State* (Fla. App. 2015) 167 So.3d 483, 490, fn. omitted [of courts addressing issue, the "vast majority . . . have found that statutory implied consent is not equivalent to Fourth Amendment consent"]; *State v. Wulff* (2014) 157 Idaho 416, 423 [337 P.3d 575, 582]; *State v. Declerck* (2014) 49 Kan.App.2d 908, 910, 922 [317 P.3d 794, 797, 804]; *State v. Wells* (Tenn. Crim. App., Oct. 6, 2014) 2014 WL 4977356, *13 ["[T]he privilege of driving does not alone create consent for a forcible blood draw. . . . [S]uch a search is not reasonable unless performed pursuant to a warrant or to an exception to the warrant requirement. The implied consent law does not, in itself, create such an exception."]; *Gore v. State* (Tex. App. 2014) 451 S.W.3d 182, 189-191, and cases cited; *State v.*

21

### III. *Exigent Circumstances*

While acknowledging that the assertion is "contrary to the trial court's ruling," respondent argues that the search may be upheld on the basis of exigent circumstances, in that "arguably, the totality of the circumstances demonstrated that in this case, dissipation of blood presented an exigent circumstance." Noting that the blood draw did not occur until two hours after the accident, respondent asserts that the officer could not have sought a warrant during this time because "it was unclear whether there was probable cause to secure a warrant." But the dispatch records show a broadcast at 11:36 p.m. that defendant ("party Arredondo") had been identified as the driver. Officer Valverde knew this was the patient he was monitoring, since he himself broadcast a minute later that the condition of "subj Arrendondo" was "life threatening." A broadcast at 11:49 p.m. reported that the "subj wearing red flannel was the driver and 1051," the latter presumably meaning "10-51," which is "ten-code" for "drunk." That defendant was the person described appears from a later entry to the effect that a "red shirt" was "taken off the driver" and collected as evidence. The next pertinent entry is at 12:22 a.m., when Valverde broadcast that "Driver Arrerondo" [*sic*] was "neg on life-threatening." At 12:32 a.m. he requested that a phlebotomist be dispatched to defendant's room in the hospital.

Further evidence of probable cause arises from Officer Valverde's own contemporaneous records. Thus, although he testified that he arrested defendant at about 12:30 p.m., he wrote on a DMV form that he had arrested defendant at 11:35 p.m.—a full 90 minutes before the blood draw. Moreover, although he dated his signature on the

---

*Padley*, *supra*, 354 Wis.2d 545, 564-565, 570 [849 N.W.2d 867, 876, 879]; see also *State v. Declerck*, *supra*, 49 Kan.App.2d at pp. 918-919 [317 P.3d at p. 802], and cases cited [noting near-unanimity of courts in holding unconstitutional statutes purporting to declare sufficient grounds to conduct a blood draw based on facts not satisfying constitutional standards of probable cause].)

22

form April 30, 2013, he appears to have corrected the "Detention/Arrest Date" to April 29—again indicating that the arrest occurred before midnight. The dispatch records also include an entry at 1:04 a.m. indicating that the arrest had occurred at "2330," i.e., 11:30 p.m.[12] Nothing in the records supports Officer Valverde's testimony that the arrest occurred an hour later. Casting further doubt on that testimony are his statements prior to the suppression hearing to the effect that he had no independent recollection of relevant events, telling the prosecutor, " 'I don't even think I went to the hospital.' "

The trial court, which refused to find exigent circumstances, must be presumed to have resolved these evidentiary conflicts in favor of the documentary record and against Officer Valverde's contrary testimony at the hearing. If Officer Valverde arrested defendant at 11:30 p.m., then he obviously had probable cause at that same time to obtain a blood sample. That was 90 minutes before blood would actually be drawn. There was no evidence that this was insufficient time to obtain a warrant. For this reason alone, we must sustain the trial court's finding that there were no exigent circumstances sufficient to justify a warrantless search.

## IV. Reliance on Statute

The trial court also upheld the search on the basis that in conducting it, Officer Valverde reasonably relied on the implied consent law, thus bringing the search within the so-called "good faith" exception to the exclusionary rule.[13] Respondent defends this ruling as an independent ground for affirmance.[14]

---

[12] The entry reads, "61F4—1015 w/ Driver Arrerondo [*sic*] at 2330." "61F4" is Officer Valverde's call sign. "1015" presumably means 10-15, ten-code for "prisoner in custody."

[13] The label "good faith" is a misnomer insofar as the exception is said to depend not on the officer's subjective mental state but on the objective reasonableness of the officer's conduct in light of the circumstances. (*People v. Willis* (2002) 28 Cal.4th 22, 29, fn. 3; see *Herring v. U.S.* (2009) 555 U.S. 135, 146 [The pertinent analysis is objective, not an 'inquiry into the subjective awareness of arresting officers' ")]; *id.* at

23

The "good faith" rule is not an exception to the warrant requirement but a limitation on the exclusionary rule, which generally bars the state from introducing, in a criminal prosecution, evidence obtained in violation of the defendant's Fourth Amendment rights. (See *Arizona v. Evans* (1995) 514 U.S. 1, 10-11.) The limitation originated in *United States v. Leon* (1984) 468 U.S. 897, which held that the fruits of a search conducted in reliance on a seemingly proper search warrant were admissible even though the warrant was later found to have been issued without probable cause. The court has since extended the exception to other situations in which officers' reasonable reliance on facts or circumstances seeming to validate a search has been held to render the exclusionary rule inapplicable. Most pertinent of these is where a search is conducted in reasonable reliance on a *statute* later held unconstitutional. In *Illinois v. Krull* (1987) 480 U.S. 340, an officer searched an auto wrecking yard pursuant to a statute authorizing such searches. State courts held the statute unconstitutional, and on that ground suppressed the results of the search. On certiorari the Supreme Court assumed the statute was unconstitutional, but held that the reasoning in *Leon* was "equally applicable to the present case." (*Id.* at p. 349.)[15] Because the officer's reliance on the statute was

---

p. 142 [in an earlier decision, "[w]e (perhaps confusingly) called this objectively reasonable reliance 'good faith.' "].)

[14] The court rejected the prosecution's theory that the officer reasonably relied on court decisions that had only recently been abrogated. That theory is not pressed on appeal, and we do not address it.

[15] In some respects *Illinois v. Krull, supra,* 480 U.S. 340 had been presaged by *Michigan v. DeFillippo* (1979) 443 U.S. 31, which held that the exclusionary rule did not apply to fruits of an unlawful *arrest* made in reliance on an ordinance later held unconstitutional. The analysis there was framed not around the reasonableness of the officer's reliance as such but on the existence of *probable cause* to believe the defendant had committed a crime, which in turn depended on whether the ordinance was reasonably believed to be valid. The court reasoned that "[a] prudent officer, in the course of determining whether respondent had committed an offense . . . should not have been

24

"objectively reasonable," the court reversed for further proceedings. (*Id.* at pp. 358, 361.) The court noted that the exception would not apply, and exclusion of evidence would be appropriate, if it appeared that (1) in passing the applicable statute, the legislature had "wholly abandoned its responsibility to enact constitutional laws"; or (2) the statute's "provisions are such that a reasonable officer should have known that the statute was unconstitutional." (*Id.* at p. 355.)

Most recently, in *Davis v. United States* (2011) 564 U.S. 229, 131 S.Ct. 2419, 2426-2427 (*Davis*), the court held that the good faith exception applied to a search conducted in objectively reasonable reliance on binding appellate precedent that was later overruled. (*Davis*, *supra*, 564 U.S. at p. ___ [131 S.Ct. at pp. 2423-2424].) The officer there conducted a search that conformed to a then-binding circuit court interpretation of *New York v. Belton* (1981) 453 U.S. 454, but that later "turned out to be unconstitutional" in light of *Arizona v. Gant, supra,* 556 U.S. 332. (*Davis*, *supra*, 564 U.S. at p. ___ [131 S.Ct. at p. 2428].) In holding the exclusionary rule inapplicable, the court explained that under these circumstances, suppression of the evidence would not advance the policies behind the rule. Specifically, there was an "absence of police culpability" because the officers "did not violate Davis's Fourth Amendment rights deliberately, recklessly, or with gross negligence." (*Ibid.*) "[W]hen binding appellate precedent specifically authorizes a particular police practice, well-trained officers will and should use that tool to fulfill their crime-detection and public-safety responsibilities." (*Id.* at p. ___ [131 S.Ct. at p. 2429].)

The good faith exception rests on the premise that the purpose of the exclusionary rule is to deter official misconduct by depriving the state of the fruits of unlawful searches. It is then supposed that when an officer acts in reasonable reliance on

required to anticipate that a court would later hold the ordinance unconstitutional." (*Id.* at pp. 37-38.)

25

circumstances that would justify a warrantless search—including the applicable law as the officer reasonably understands it to be—no deterrent effect is achieved by suppressing evidence.  It follows that if the officer reasonably relied on a statute authorizing the search, the statute's later invalidation will not justify suppression of evidence.[16]

As applied here, this reasoning presents two questions:  (1) Does substantial evidence support the trial court's implied finding that Officer Valverde relied on the statute; and (2) was such reliance "reasonable" for purposes of the exception?  The first question is made more difficult than it might have been by the complete absence of questioning at the suppression hearing concerning Officer Valverde's reasons for not securing a warrant.  On the one hand he appeared to testify that he had never in his career applied for a warrant, which might have opened the door to an inference that he simply never thought of getting one.  Nor was he asked whether, at the time of the blood draw, he believed that the implied consent law authorized him to forego a warrant.  As set forth in the margin, however, he did testify that in his dealings with defendant he relied on forms generated by the Department of Motor Vehicles to guide officers in carrying out,

---

[16] Not everyone would agree that deterrence is the sole or even predominant benefit to be achieved through the exclusionary rule.  It might also be viewed as restorative, i.e., it places the victim of a constitutional violation back in the position, or as near to it as possible, occupied before the violation took place.  And it may also be said to draw support from an equitable perception that the state should be no more entitled than a private individual or enterprise to take advantage of its own wrong.  Ultimately, however, the rule seems to rest on a more fundamental calculus:  to permit the state to invade constitutional rights without consequence has the  practical effect of converting them from actual rights to mere precatory privileges enjoyed at official sufferance.  Under any of these alternative or additional rationales, the good faith exception seems more difficult to justify.  Further, it has been suggested that even given exclusive reliance on a deterrence rationale, the good faith rule removes much of the incentive for raising close Fourth Amendment issues, thereby threatening to "ossify the law of search and seizure." (L. Rosenthal, *Seven Theses in Grudging Defense of the Exclusionary Rule* (2013) 10 Ohio St. J. Crim. L. 525, 548.)

26

and to memorialize their compliance with, the implied consent law.[17] This testimony, coupled with the forms themselves, supports an inference that the officer was quite

_____

[17] "Q. . . . [S]how you what's been marked for identification as People's 3, the three-page DMV form. . . . Do you recognize this document?

"A. Yes, ma'am, I do.

"Q. And what is it?

"A. It is the DMV paperwork that we use for the DUIs.

"Q. And did you execute that document at or about the time the phlebotomy technician came to take blood from Mr. Arredondo?

"A. Yes, ma'am.

"[¶] . . . [¶]

"Q. . . . . Is [this form] something that you fill out in the normal course of business when you are there to supervise a blood draw?

"A. Well, this right here—the top one right here is a Admin Per Se. It's a DMV Admin Per Se. This right here is the paperwork that we fill out for the DUI portion, yes. . . .

"[¶] . . . [¶]

"Q. Okay. Is there a page in there talking about the drug admonition and the choices a person can take?

"A. Yes, ma'am.

"Q. And is it your understanding that refers to the implied consent that drivers in California subject themselves to alcohol screening?

"A. Yes, ma'am.

"Q. And when a person is conscious who is under arrest, do you read the form to them?

"A. Yes, ma'am.

"Q. And is this the form, part of which is in People's 3 for identification?

27

literally relying on the statute, albeit as mediated through the forms developed by the DMV.  Indeed one page of those forms cited section 23612, although that page was not used by Officer Valverde because it set out admonitions to be given to a suspect who is conscious.

This leaves the question whether the officer's reliance on the statute was reasonable.  As we have noted, no court had ever held the statute sufficient by itself to justify a warrantless search—with the possible exception of the dictum in *Bloom*, *supra*, 142 Cal.App.3d 310, 316, which no other decision has ever followed or even acknowledged.  On the other hand, no California court has held before today that the consent imputed by the statute is *not* a sufficient basis to dispense with a warrant.  Under the law predating *McNeely*, it hardly mattered whether the statute justified a warrantless search of its own force because warrantless blood draws were considered more-or-less categorically exempt from the warrant requirement under federal and state judicial precedents.  (See *Harris II*, *supra*, 234 Cal.App.4th at p. 680, citing *Harris I*, *supra*, 225 Cal.App.4th Supp. at p. 5 [prior to *McNeely*, "California courts uniformly interpreted *Schmerber* as permitting forced blood draws based solely on probable cause of DUI because the natural dissipation of alcohol or drugs in the blood was itself an exigent circumstance"]; see *Schmerber*, *supra*, 384 U.S. 757; cf. *People v. Duroncelay*, *supra*, 48 Cal.2d 766.)  Given that caselaw, neither the courts nor the Legislature had any occasion to consider whether the statute's imputed consent could justify a warrantless search.  The question was academic.

"A. Yes, ma'am.

"Q. And did you read the form to Mr. Arredondo in his hospital room at the time or right before the blood was  being taken?

"A. No, ma'am.  He was unconscious."

28

In any event, officers cannot be expected to parse duly enacted laws to determine their intended effect, or their permissible operation in light of constitutional rights they may implicate.  Officers can only be required to stay within the constitutional confines articulated by the courts or, less frequently, the Legislature.  Here the latter had flatly declared that an unconscious person is "deemed" to have consented to a search, and that in such a case "a test or tests may be administered" without further ado.  (§ 23612, subds. (a)(1), (a)(5).)  In the absence of judicial precedent to contrary effect, we cannot say that Officer Valverde's reliance on that provision was unreasonable.  We therefore conclude that although the search here was unconstitutional, its fruits were admissible under the "good faith" exception as articulated by the Supreme Court.

## V.  Probation Condition

Defendant challenges as vague and overbroad a probation condition stating that he "shall not possess or consume alcohol or illegal controlled substances or knowingly go to places where alcohol is the primary item of sale."  He contends that the condition should be modified to read that he "shall not knowingly possess or consume alcohol or illegal controlled substances . . . ."

The trial court here has already properly identified the need for defendant's express knowledge in connection with its prohibition on "knowingly go[ing] to places where alcohol is the primary item of sale."  We find the remainder of the condition regarding possession and consumption sufficiently clear to apprise defendant of the nature and scope of the prohibited conduct.  (See *In re Sheena K.* (2007) 40 Cal.4th 875, 890.)  A second express knowledge reference in this condition is therefore unnecessary.

### DISPOSITION

The judgment is affirmed.

29

_____

RUSHING, P.J.

WE CONCUR:


_____

MÁRQUEZ, J.


_____

GROVER, J.


*People v. Arredondo*
**H040980**

30

Trial Court:                                    Santa Clara County
                                                Superior Court Nos.: C1363765 &
                                                C1365187


Trial Judge:                                    The Honorable Griffin M. J. Bonini


Attorney for Defendant and Appellant            Sidney S. Hollar
Marcus Arredondo:                               under appointment by the Court
                                                of Appeal for Appellant


Attorneys for Plaintiff and Respondent          Kamala D. Harris
The People:                                     Attorney General

                                                Gerald A. Engler,
                                                Chief Assistant Attorney General

                                                Catherine A. Rivlin,
                                                Supervising Deputy Attorney General

                                                Karen Z. Bovarnick,
                                                Deputy Attorney General


*People v. Arredondo*
**H040980**